1

2            ORIGINAL

3

US DISTRICT COURT
DISTRICT OF NEW JERSEY
LAW DIVISION - MERCER COUNTY
CASE NO:

4

5     --------------------------
      STATE TROOPERS FRATERNAL   :      COMPELLED
      ASSOCIATION OF NEW JERSEY, :      INTERVIEW OF:
6     INC.,                      :
                                 :    CHRISTOPHER BURGOS
7                    PLAINTIFF,  :
                                 :
8          vs.                   :
                                 :
9     STATE OF NEW JERSEY,       :
      SUPERINTENDENT OF THE NEW
10    JERSEY STATE POLICE JOSEPH
      R. FUENTES, IN HIS
11    OFFICIAL CAPACITY,

12                   DEFENDANT.
      --------------------------

13

14

15

16        TRANSCRIPT of the stenographic notes of the

17    proceedings taken in the above-entitled matter, as

18    taken by GINA BIALAS, a Certified Court Reporter and

19    Notary Public of the State of New Jersey, at the Office

20    of Law Enforcement Professional Standards, 810 Bear

21    Tavern Road, Suite 310, Ewing, New Jersey, on February

22    26, 2013, commencing at 10:10 a.m.

23

24

25

```
 1              A P P E A R A N C E S

 2      LOCCKE, CORREIA, LIMSKY & BUKOSKY, ESQS.

 3      BY:  MICHAEL BUKOSKY, ESQ.

 4      24 Salem Street

 5      Hackensack, New Jersey 07601

 6      ON BEHALF OF TROOPER BURGOS

 7

 8

 9      JEFFREY CHIESA, ESQ.

10      ATTORNEY GENERAL

11      BY:  VINCENT J. RIZZO, JR., ESQ.

12      DEPUTY ATTORNEY GENERAL

13      Hughes Justice Complex

14      Division of Law

15      25 Market Street,

16      Trenton, New Jersey

17      ON BEHALF OF THE DEFENDANTS

18

19      OFFICE OF LAW ENFORCEMENT PROFESSIONAL

20      STANDARDS

21      BY: MANUEL QUINOA

22      CHIEF STATE INVESTIGATOR

23

24      DSG FIRST CLASS WILLIAM HARKNESS

25
```

1                           I N D E X

2

3

4       WITNESS                                              PAGE

5       EXAMINATION BY MR. HARKNESS                           16
        EXAMINATION                                           71
6       BY MR. QUINOA:
        EXAMINATION                                           72
7       BY MR. HARKNESS:
        EXAMINATION                                           75
8       BY MR. QUINOA:
        EXAMINATION                                           82
9       BY MR. HARKNESS:
        EXAMINATION                                           83
10      BY MR. QUINOA:

11      EXAMINATION                                           84
        BY MR. HARKNESS:
12      EXAMINATION                                           86
        BY MR. QUINOA:
13
        EXAMINATION                                           90
14      BY MR. HARKNESS:

15

16

17

18

19

20

21

22

23                              JOHN F. TRAINOR, INC.
24                              BY:  GINA BIALAS
                                CERTIFIED COURT REPORTER
25                              LICENSE NO.:  XIO-1611

1    MR. HARKNESS:  Right now I am showing

2    Trooper Burgos the Reportable Incident Form of the

3    SP-525.  That document is on behalf of the actual

4    allegation that came into OPS.  I believe the date is

5    October 18th for that particular document.

6        MR. RIZZO:  Mike, do you want to mark

7    these and attach them?

8        MR. HARKNESS:  I would prefer that

9    everybody who looks at them, I'm going to sign, he's

10   going to sign, everybody else would at least apply

11   their initials if that's okay.

12       MR. RIZZO:  Well, yes.  I am thinking in

13   general terms like when we do depositions, as you show

14   him something it gets marked for identification

15   purposes for the record so that when it is discussed or

16   referred to it has a specific destination.  Is that

17   okay with you, Mike, if we do that as he goes along?

18       MR. BUKOSKY:  Do you want to mark them as

19   exhibits?

20       MR. RIZZO:  Yes.  And attach them to the

21   court reporter's transcript.

22       MR. BUKOSKY:  I think that's fine.  And I

23   definitely think starting out, we are on the record

24   now, that we should indicate the date and who is in the

25   room.

1          MR. HARKNESS:  I will do that.  When I go

2    on the digital recording, we are going to do all that.

3          MR. BUKOSKY:  And, I guess, I will mark

4    this as Exhibit A.

5          MR. RIZZO:  Well, are you going to show

6    him these once the official --

7          MR. HARKNESS:  Yes.

8          MR. BUKOSKY:  I am looking at right now a

9    form called New Jersey State Police Office of

10   Professional Standards Principal Acknowledgment Form

11   that Officer Burgos was requested to execute which is

12   the standard form.

13          I would just have two comments.  One is

14   that, one portion of it indicates that the contents of

15   this investigation will not be disclosed to anyone.  We

16   sort of have a unique case here because it is being

17   transcribed and that transcription is intended to be

18   part of that federal case so I think it is understood

19   that disclosing it in the context of that federal case

20   is not a violation of this agreement.

21          And also that if there is some concerns or

22   something like that, we can obviously address that

23   within the context of the federal proceeding.

24          Also, I would note that the form indicates

25   that Officer Burgos would be advised as to the specific

1    nature of the complaint so I would imagine that will

2    happen.

3                MR. RIZZO:  Yes.  I have no problem with

4    any of that.  I wouldn't want to have the Weingarten

5    Form act as any way to try and prevent any disclosures

6    that you said should be part of the federal case.  I

7    have no problem with anything that you stated.  If, in

8    fact, this goes on and more documents are needed or

9    requested, our normal routine is to enter into a

10   confidentiality agreement where the specifics are laid

11   out and signed by the Court so documents can be

12   exchanged that would not ordinarily be subject to

13   public disclosure.  So that's another way of taking

14   care of it if the proceeding continues on for some

15   reason beyond this, the initial show of cause.

16               MR. HARKNESS:  525, you're satisfied with

17   that, sir?  Did you get a chance to review it?

18               MR. BUKOSKY:  You're asking me if I

19   reviewed it?  Yes.  I have reviewed it.

20               MR. HARKNESS:  Anybody else would like to

21   see the 525?

22               MR. RIZZO:  I would.

23               MR. HARKNESS:  I'm now presenting Trooper

24   Burgos with his Letter of Declination received from the

25   Division of Criminal Justice.  It's dated February 7th,

1    2013.  It identifies Trooper Burgos as the principal.

2    The allegation that was reviewed was for theft.  I have

3    to put on the record that this particular Letter of

4    Declination has an incorrect Internal Affairs' case

5    number.  It is identified as 2011-0361.  The case in

6    question here is 2011-0596.  Any questions?

7                    MR. BUKOSKY:  No.

8                    MR. HARKNESS:  Would anybody else like to

9    review the document?  No.  I am now presenting Trooper

10   Burgos with a New Jersey State Police Office of

11   Professional Standards Material Witness Notification

12   List for Principals.  It is case 2012-0596.  Would you

13   mind initialing that, sir.

14                   MR. BUKOSKY:  Am I getting copies of all

15   these documents?

16                   MR. HARKNESS:  Not through me per se but

17   maybe you can request it through him.

18                   MR. RIZZO:  Send me a letter telling me

19   specifically what it is you want then I don't see why

20   not.  It's all part of the same thing.  It has to go

21   before the Judge.  Some of it may wind up being

22   attachments so...

23                   MR. HARKNESS:  I am now presenting the

24   Weingartner Representative Acknowledgment Form to your

25   attorney for him to review and sign.  I am now

1  presenting a copy of an E-Mail correspondence from

2  Katherine Hartman sent on Thursday, August 16th, 2012,

3  at 9:56 a.m. to three E-Mails.  The one in question

4  here, the one relevant here is the one identified as

5  Chris Burgos cburgos@staf.org.  The subject is FW as in

6  forward Freites extension.  I am going to present this

7  to Trooper Burgos for his review.

8           MR. BUKOSKY:  I just make a note for the

9  record.  At this point it seems like we are going to

10  start with the substantiative aspects of the interview

11  here.

12           MR. HARKNESS:  No, sir.  I'm not asking a

13  thing until I go on the digital recorder.  I am

14  allowing him to review some documents and you to and

15  anyone else who would like to see them.

16           MR. BUKOSKY:  Okay.

17           MR. HARKNESS:  Any questions about that?

18           MR. BURGOS:  No.

19           MR. HARKNESS:  Anybody else?

20           MR. RIZZO:  No.

21           MR. HARKNESS:  I am now providing Trooper

22  Burgos with a copy of the State New Jersey Office of

23  Administrative Law Board of Extension.  It is OAL

24  Docket Number POLO1779-12S just for his review.  Any

25  questions, sir?

1              MR. BURGOS: No.

2              MR. HARKNESS:  I am now presenting Trooper

3    Burgos with a copy of the New Jersey State Police

4    Internal Investigation Review Sheet for case 2009-0354.

5    It is an eight-page document.  It does have some

6    redactions in it.  If it was completely redacted it

7    would be completely marked.  So I tried to be somewhat

8    commonsensical about what was redacted for review.  Any

9    questions?

10             MR. BURGOS:  No.

11             MR. HARKNESS:  That's all I have as far as

12   documents to review.  Prior to going on the digital

13   recorder, I would like to offer the opportunity, what I

14   like to do in my Internal Affairs interview, is to

15   offer the opportunity to dialogue about this matter.

16   You're sitting here before us for the allegation of

17   unauthorized release of information and failure to

18   disclose to the Division information that would be

19   important to the Division.  So I am offering the

20   opportunity to you before we go officially on the

21   record to discuss any of that at all.

22             MR. BURGOS:  I have nothing.

23             MR. HARKNESS:  Okay.

24             MR. BUKOSKY:  The only thing I would

25   indicate initially before we get into the

1   substantiative review is that, I just want to make sure

2   that we understand and the record reflects that Officer

3   Burgos here is under orders to submit to this interview

4   today.   I wanted that to be made perfectly clear

5   because if he is not being ordered, then we

6   respectfully decline to be here.   I think that needs to

7   be definitely clarified because we understand him to be

8   ordered to be here.

9           We would also note that because of the

10  nature and scope of the investigation as described so

11  far, we would understand the subject matter to be

12  routine union activity concerning his representation of

13  members in disciplinary cases which are routine events.

14  Because of that, we would understand the entirety of

15  the investigation to be privileged either under the

16  attorney-client privilege or the Freedom of Association

17  First Amendment Rights not to disclose that type of

18  information.

19          I would also note that because this,

20  matter appears to be under the continued criminal

21  review, that certain Fifth Amendment Rights would be

22  applicable to this particular proceeding and because he

23  is being ordered directly under pain of dismissal to

24  provide these statements, we would understand any and

25  all of his statements to be protected under the Fifth

1     Amendment.

2          MR. RIZZO:  First, I hope I don't leave

3     anything out, when you say ordered to be here, are you

4     talking about order of the Court pursuant to the Order

5     to Show Cause that you filed and/or order of the State

6     Police to participate in an internal investigation?

7          MR. BUKOSKY:  Order of the State Police,

8     his employer.

9          MR. RIZZO:  Okay.  There also is an order

10    by the Court as a result of the hearing that was

11    initiated by Judge Sheraton in response to your Order

12    to Show Cause that he appear and answer these

13    questions.  Am I right about that?

14          MR. BUKOSKY:  No.  There is no such order.

15          MR. RIZZO:  The Judge did not order him to

16    appear to submit to the questioning?

17          MR. BUKOSKY:  No.  The only thing the

18    Judge declined was to enjoin this interview.  There is

19    no order that he must attend by the Court.

20          MR. RIZZO:  Now, the second thing is, you

21    said something about the confidentiality of the

22    investigation, the normal confidentiality attached to

23    an OPS investigation.  I don't see any reason why that

24    would change other than the fact that there is a

25    federal action which you filed so obviously some things

 1    are going to be public record because your Order to

 2    Show Cause was filed, your verified complaint was

 3    filed.  There will be Court hearings which will be

 4    necessarily of a public record.  So to the extent that

 5    the two intertwine, there is going to be some public

 6    revelation as a matter of course.  So I don't want that

 7    to be confused or to be held against the State Police

 8    because they are responding in a public forum to a

 9    legal proceeding that you filed.  Am I in error in

10    anything?

11              MR. BUKOSKY:  No.  I think we should

12    consult to make sure that the confidentiality of this

13    process continues to be ensured for both sides.  So

14    nothing foolish should be done and while I respect the

15    confidentiality of this proceeding and with respect to

16    Officer Burgos as well as the State Police.  We will

17    take whenever actions we need to do, you and I, to make

18    sure that we don't infringe upon that in any way.

19              MR. RIZZO:  And I don't have any problem

20    with that and I know that Trooper Burgos and yourself

21    are aware that OPS internal proceedings are

22    confidential by SOP and probably other applicable laws

23    too.  It's not like anybody is going to be going and

24    broadcasting what's going on here at least from that

25    perspective.  All right?

1          MR. BUKOSKY:  Correct.

2          MR. RIZZO:  The other thing that struck me

3    was you indicated that there are still a criminal

4    investigation going on?

5          MR. BUKOSKY:  Yes.  I was referred to a

6    letter, and we probably should make it part of the

7    record, that indicated that there certainly was a

8    criminal investigation open concerning theft that

9    applied to this matter, that the case is still being

10   held open to see if there is any further evidence to be

11   collected concerning that open criminal investigation.

12         MR. RIZZO:  Maybe I was wrong, but I

13   thought it was Declination Letter?

14         MR. HARKNESS:  It's a Letter of

15   Declination.

16         MR. RIZZO:  Which means that?

17         MR. HARKNESS:  Its been reviewed.

18         MR. RIZZO:  That CJ reviewed it and

19   declined to proceed with any kind of criminal

20   investigation concerning that particular charge.

21         MR. BUKOSKY:  Well, they definitely

22   decline at the present time.  However, they left the

23   window open, I guess, for anything that comes out of

24   this interview today.

25         MR. RIZZO:  Based on what?

1        MR. BUKOSKY:  I don't know.  You have to

2   read the letter.  They said if something comes up we

3   want to hear about it.

4        MR. RIZZO:  Okay.  In other words, if they

5   uncover different evidence, they can start a new

6   investigation.  But as of February 7th, 2013, based on

7   a letter from Dermot O'Grady of the Division of

8   Criminal Justice, they declined to proceed with any

9   kind of criminal investigation.  You do understand

10   that?

11        MR. BUKOSKY:  I understand that.  I

12   certainly don't think this is a criminal case by any

13   measure but my opinion doesn't count.  Apparently

14   someone in the State believes it may be criminal in

15   nature, and in such a case we would assert our Fifth

16   Amendment Rights.  However, we also understand that we

17   are being ordered today to provide a statement.

18        MR. RIZZO:  Okay.  I don't have any

19   dispute with that other than there is no criminal

20   investigation pending now.  If he exerts his Fifth

21   Amendment Rights, we can deal with that at the time it

22   happens.  I don't see that occurring but certainly he

23   is entitled to exert that privilege if he feels there

24   is criminal matters that come up in a question.  I

25   don't believe this proceeding, because it clearly

1    states in the letter this is an administrative

2    proceeding, not a criminal proceeding, so I don't think

3    anything like that is going to come up.  Was there

4    anything else you wanted to put on the record that you

5    discussed as a preamble before we begin?

6                MR. BUKOSKY:  That's all.  I just think we

7    should confirm that he's under direct orders to provide

8    this statement.

9                MR. RIZZO:  Well, he is under direct

10   orders as per SOP's of the State Police.  Any sworn

11   member who OPS receives a complaint about and is named

12   as a principal in an investigation, is by SOP ordered

13   to participate pursuant to his oath of office, pursuant

14   to his obligations as a State Police Officer, pursuant

15   to his obligations as a law enforcement officer he has

16   to participate.  That's the rules and regulations.

17               MR. BUKOSKY:  All right.  So we understand

18   that he is being ordered to provide this statement and

19   that seems to be what you're telling me.

20               MR. RIZZO:  Yes.  Okay.

21               MR. HARKNESS:  The date is February 26th,

22   2013.  The time is now 10:33 a.m.  My name is Detective

23   Sergeant First Class William Harkness, Badge 5355.  I

24   am currently assigned to the Internal Affairs

25   Investigation Bureau, that's the Central Unit.  More

1    specifically Toms River, New Jersey.  I am currently

2    the Assistant Unit Head of that particular location.

3              I am sitting here at Bear Tavern, OPS Bear

4    Tavern in the more formal of the two conference rooms

5    to the back of the building.  Bear Tavern is located in

6    Ewing, New Jersey and it is the headquarters of OPS.

7              The interview before me will be with

8    Trooper I Christopher Burgos, Badge 4276.  He's a

9    principal regarding the internal investigation

10   2012-0596.

11             I also want to immediately put on the

12   record there is five other people here.  Excuse me.

13   Four other people here besides myself and Trooper

14   Burgos and I will put them on the record momentarily.

15   EXAMINATION

16   BY MR. HARKNESS:

17

18        Q     I will start with you, Trooper Burgos.

19   Can you please state your full name and spell your last

20   name, sir.

21   A        Trooper I Christopher J. Burgos, B-u-r-g-o-s,

22   Badge number 4276.

23        Q     And what is your age and date of birth.

24   A        49 years old.  August 14th, 1963.

25        Q     What New Jersey State Police Academy class

1     did you graduate?

2     A       104.

3             Q       And do you recall the graduation date?

4     A       June 19th, 1986.

5             Q       And what is your present assignment?

6     A       I am detached to the Administrative Section

7     while fulfilling my duties as the elected President of

8     the State Troopers' Fraternal Association.

9             Q       And what was your assignment on August

10    16th, 2012?

11    A       I believe the Human Resources Section at that

12    time before the move -- well, before the move over to

13    the Administrative Section.

14            Q       You mentioned that you have a position

15    within the State Troopers' Fraternal Association.  Can

16    you just identify it for the record, please.

17    A       I'm Elected President of the State Troopers'

18    Fraternal Association of New Jersey which represents

19    all troopers under the rank of Sergeant in the State

20    Police.

21            Q       And when were you elected to that

22    particular position, sir?

23    A       January 1st of 2012.

24            MR. HARKNESS:  Very good.  Also in

25    attendance, I'm going to go clockwise just for the

1    record, Trooper Burgos is sitting to my left and a

2    gentleman is sitting to his left. I am going to start

3    with the gentleman sitting next to him and will ask

4    everybody in a clockwise fashion to identify

5    themselves, state their full name, spell their last

6    name, their affiliation of what agency they are with

7    and their relevance here today, please. Sir, when

8    you're ready.

9              MR. BUKOSKY: Yes. Michael Bukosky,

10   B-u-k-o-s-k-y, on behalf of Officer Burgos.

11             MR. QUINOA: Manuel P. Quinoa,

12   Q-u-i-n-o-a, Office of Law Enforcement Professional

13   Standards.

14             MR. RIZZO: Vincent J. Rizzo, Jr., Deputy

15   Attorney General, Division of Law. I am here on behalf

16   of the State Police.

17   BY MR. HARKNESS:

18

19        Q      Prior to going to -- prior to me turning

20   on the digital recorder, I presented Trooper Burgos

21   with several documents for his review and his

22   attorney's review and whoever else in the room

23   requested to do so. At that time, sir, Trooper Burgos,

24   did I present you with a New Jersey State Police Office

25   of Professional Standards Principal Acknowledgment Form

1    for investigation number 2012-0596?

2    A     Yes.

3         Q     Do you have any questions about that, sir?

4    A     No.

5              MR. HARKNESS:  Sir, do you have any

6    questions about the particular document?

7              MR. BUKOSKY:  No.

8    BY MR. HARKNESS:

9

10        Q     Very good.  Thank you.   I also produced

11   or provided a document from the State of New Jersey

12   Division of Law and Public Safety, Division of Criminal

13   Justice dated February 7th, 2013.   It identifies

14   Trooper Christopher Burgos, Badge 4276 as the principal

15   in this particular matter.  The allegation of theft was

16   reviewed by the Division of Criminal Justice and a

17   Letter of Declination was produced by Dermot O'Grady

18   from Criminal Justice.

19              The only thing I want to put on record as

20   well is the letter identifies the incorrect case

21   number.  The case number, the incorrect case number is

22   2011-0361.   Our matter before us is 2012-0596.

23              Sir, can you take a look at that

24   particular document and review it for yourself.   Any

25   questions?

1    A      No questions.

2              MR. HARKNESS:  Sir, do you have any

3    questions?

4              MR. BUKOSKY:  No.

5    BY MR. HARKNESS:

6

7        Q      Also provided for the record was a New

8    Jersey State Police Reportable Incident Form for case

9    number 2012-0596.   The date in question is 10/18/2012.

10   That -- this particular report identifies the

11   allegation as it was received by OPS on October 18th,

12   2012.   Trooper Burgos, can you take a look at the

13   document, please.   Any questions?

14   A      No questions.

15             MR. HARKNESS:  Sir, do you have any

16   questions?

17             MR. BUKOSKY:  No.

18   BY MR. HARKNESS:

19

20       Q      Also provided for the record was a New

21   Jersey State Police Office of Professional Standards

22   Material Witness Notification List for principals for

23   investigation number 2012-0596.   Trooper Burgos,

24   please review that.   Any questions, sir?

25   A      No.

1              MR. HARKNESS:  Sir, do you have any

2    questions?

3              MR. BUKOSKY:  No.

4    BY MR. HARKNESS:

5

6         Q    Also provided for the record was a

7    Weingarten Representative Acknowledgment Form.  I

8    provided this to Mr. Bukosky.  He reviewed it and he

9    also applied his signature and I applied mine as well.

10   Sir, can you please review that document?

11             MR. BUKOSKY:  Yes.  I reviewed it.

12             MR. HARKNESS:  Any questions?

13             MR. BUKOSKY:  No.

14             MR. HARKNESS:  For the record too, I

15   didn't indicate earlier, all those documents that

16   allowed for signatures were signed by Trooper Burgos

17   and myself and the initials of his attorney were

18   applied as well.

19   BY MR. HARKNESS:

20

21        Q    Trooper Burgos, according to the rules and

22   regulations and in a particular SOP B-10 Section 11,

23   Subsection D, all members of the Division of the State

24   Police are obligated to answer questions and provide

25   full and complete information to investigating

1    officers.  Less than complete candor during any

2    statement may lead to serious disciplinary sanctions

3    which may include suspension and/or termination.  Do

4    you understand the statement?

5    A      Yes.

6           MR. HARKNESS:  This investigation stems

7    from the unauthorized release of information more

8    specifically the OPS Supervisory Review Sheets

9    pertaining to Internal Investigation number 2009-0354.

10   A witness in this investigation, the Internal

11   Investigation, 2012-0596, identifies Vincent Nuzzi,

12   Esq, identified you on December 4th, 2012, as the

13   person who ultimately provided the documents in

14   question to him.  Mr. Nuzzi also led, you received the

15   documents from Katherine Hartman, Esq. on August 16th,

16   2012, after she received them from an OPS member.

17        Is anybody else electronically recording this

18   interview?

19           MR. BUKOSKY:  No.

20           MR. QUINOA: No.

21           MR. RIZZO:  No.

22           MR. BURGOS:  No.

23           MR. HARKNESS:  I will indicate that this

24   is a little unusual to have a court stenographer here,

25   but in this case it's been put in place.  At this time,

1    I want to identify the allegations in question.  The

2    first allegation in question is failure to notify

3    Division and/or supervision of information which the

4    Division takes cognizance.  If proven true, this would

5    be a violation of Article V, Section Eight of the rules

6    and regulations of the Division which reads, "A member

7    shall communicate promptly through the Division chain

8    of command all crimes, breaches of peace, suicide,

9    attempted suicide, fires, accidents, complaints,

10   misconduct or other information which the Division

11   takes cognizance that may come to the member's

12   attention during the performance of such member's duty.

13   A member shall not withhold any information on matters

14   for any reason".  That's allegation number one.

15          Allegation number two falls within the

16   rules and regulations titled conflicts of interest.

17   This will be regarding unauthorized release of

18   information that we discussed or that's been introduced

19   thus far.  According to Article 13, Section 19, four

20   sections apply A, B, C and D.  A member -- according

21   to A, Section A, "Will not willfully disclose to any

22   person whether or not for pecuniary gain any

23   information not generally available to members of the

24   public which such member receives or acquires in the

25   course of and by reason of official duty unless

1    specifically authorized by competent Division

2    authority".

3         B. "Treat as confidential unless the

4    contrary is specifically authorized by competent

5    Division authority, any matters or information which

6    pertain to the Division, its operations,

7    investigations, or internal procedures".

8         C.  "Not disseminate, distribute or supply

9    to any unauthorized member or any other person an

10   original copy or abstract of any Division document

11   unless specifically authorized by competent Division

12   authority".

13        And D. "Release such information which

14   pertains to Division as may from time to time be

15   authorized by competent Division authority to any

16   person or to the news media upon request.  Nothing

17   contained herein shall be construed as denying to the

18   public information they have a right to obtain from the

19   Division pursuant to law."

20        Any questions about that from anybody in

21   the room?

22        MR. BURGOS:  No.

23        MR. RIZZO:  No questions.

24        MR. HARKNESS:  Thank you.  I just want to

25   put on the record, I provided Trooper Burgos prior to

1    me turning on the digital recording a chance to review

2    an E-Mail correspondence from Katherine Hartman.  It

3    was dated Thursday, August 16th, 2012, at 9:56 a.m.

4    There are three E-Mails in question.  The one that's

5    relevant with this particular interview is to Chris

6    Burgos in parenthesis is (cburgos@stfa.org).  The

7    subject is a forward and it says, "The Freites

8    extension".  So I am just going to ask you for the

9    record if you can just read the contents of that

10   particular document into the record, please.

11              MR. BUKOSKY:  I'm going to object to that

12   being read in the record.  We would understand that

13   communication to be protected under the attorney-client

14   privilege.

15              MR. HARKNESS:  Very good.

16   BY MR. HARKNESS:

17

18        Q     Sir, I also provided you with State of New

19   Jersey Office of Administrative Law Order of Extension.

20   This is a photocopy of OAL Docket Number POLO1779-12S

21   just for your review.  Did I allow you to do that

22   beforehand?

23   A     Yes.  You did.

24        Q     Any questions?

25   A     No.

1            MR. HARKNESS:  Sir, would you like to take

2    another look at that?

3            MR. BUKOSKY:  No.  I've seen it.  Thank

4    you.

5    BY MR. HARKNESS:

6

7        Q      Very good.  Also for the record, I

8    allowed Trooper Burgos to review an eight-page

9    document, a New Jersey State Police Internal

10   Investigation Review Sheet for case number 2009-0354.

11   Again, there are some redactions.  I didn't redact the

12   whole entire document for -- it would have covered

13   essentially most of the document to do so.  I wanted

14   Trooper Burgos to at least be able to review it and

15   identify it for the record.  Did you identify that

16   document?

17   A      Yes.

18       Q      Very good.  At this time, if there are no

19   questions of me, I am going to turn the floor over to

20   Trooper Burgos.  I am going to ask him to provide me

21   with a statement regarding his entire knowledge of this

22   matter and describe and explain all your specific

23   actions taken regarding this particular unauthorized

24   release of information and the pertinence to this

25   particular E-Mail that I identified from Katherine

1   Hartman that you received on Thursday, August 16, 2012,

2   at 9:56.  So take a moment and composure your thoughts.

3   I am looking from the A to Z for this.  Everything that

4   you can recall from the time you woke up that day on

5   August 16th to every action you took and then anything

6   after that that is relevant to this matter.  I am

7   asking you to do so when you get a chance, sir.  When

8   you're ready.

9   A       August 16th, 2012, without anything to review as

10  to my activities that day, I couldn't even tell you

11  what occurred that day as far as where I was or what my

12  obligations were.  But it was a weekday so I was doing

13  association business in some fashion and the E-Mail

14  that you have was from my STFA legal defense assistance

15  plan attorneys who I have an agreement with to

16  represent members of STFA.  I reviewed same E-Mail as

17  sort of routine discovery for another matter and I

18  forwarded information to Vincent Nuzzi who is also an

19  STFA attorney that represents members of our

20  association.

21       Q       Anything else, sir?

22  A       No.

23       Q       For the record, what I'd like to do then,

24  if it is okay with you, I am going to resort to a

25  question and answer.  If that's okay.  Some things you

1    kind of touched on.  Many you didn't.  Is that okay?

2                    MR. BUKOSKY:  That's up to you.

3                    MR. HARKNESS:  Okay.  We'll continue on.

4    BY MR. HARKNESS:

5

6         Q     Trooper Burgos, can you please describe

7    your role as STFA President?

8         A     The role of the STFA President, the State

9    Troopers' Fraternal Association is to recognize the

10   Collective Bargaining Group for all troopers under the

11   rank of Sergeant.  We incorporated in October, October

12   28th of 1963, and we have been up to the present the

13   recognized Collective Bargaining Group for all troopers

14   under the rank of Sergeant.  We represent members in

15   negotiations and all other contractural management

16   labor issues that affects our member's terms and

17   conditions of employment.  And I have been in that role

18   as Elected President since January 1st, 2012, to the

19   present.

20            In my 27 -- almost 27 years with the Division, I

21   have held the positions of Station Representative

22   from -- going back to 1988 and I was Elected Officer to

23   the STFA from 1999 to the present holding various

24   positions, Sergeant at Arms, Vice President for

25   Legislation and Grievances, Second Vice President,

1    First Vice President for the past nine plus years

2    before being Elected President.

3    BY MR. HARKNESS:

4

5         Q        Okay.  Sir, what are your primary duties,

6    can you identify them for the record, in that role?

7    A        I am detached to the Administrative Section at

8    this time to conduct association business day-to-day as

9    it presents itself and we work in relationship with the

10   Office of Labor Relations at Division Headquarters on a

11   regular basis on matters involving terms and conditions

12   of employment for troopers.

13        Q        Are your duties that you discussed, are

14   they enumerated in any particular document?

15   A        In the STFA contract as far as the language

16   regarding the President, First Vice President that we

17   are to give priority to our day jobs and we are, with

18   the permission of the Superintendent, to conduct our

19   duties uninterrupted, to conduct association business

20   properly and upon emergencies there is a recall

21   provision in there but other than that, we do conduct

22   our business as we see fit and we do also -- I maintain

23   the in-service training weapons, qualifications and all

24   their in-service requirements that are required of an

25   enlisted trooper.

1      Q      Okay.  That sounds like a description of

2    how the Division recognizes your job?

3    A      Yes.

4      Q      Do you have another document that actually

5    describes your duties?

6    A      No.  I do not.

7      Q      And the union has nothing like that on

8    file that you're aware of, right?

9    A      No.  Well, let me just say, we have a

10   constitution and bylaws that we have in effect.  That's

11   part of our incorporation papers and that describes the

12   duties of the -- each officer or representative and

13   such.  So there is a document that exists.

14     Q      Is that a document I can get for this

15   particular internal investigation?

16   A      Sure.

17     Q      Okay.  Thank you.  You mentioned that you

18   have been with the Division 27 years.  I just wasn't

19   sure about the total numbers of years you have been

20   with the STFA.  I know you started as a Station Rep.

21   Can you identify the amount of years you've actually

22   been involved with STFA.

23   A      Well, from the time I graduated the academy June

24   19th, 1986, a member in good standing, dues paying

25   member from that date forward in its entirety.  And I

1    became a Station Representative of the Bloomfield

2    Station about two years into my service with the

3    Division as the Bloomfield Station Rep.  Then I became

4    the Troop Rep for the Parkway in addition to being the

5    Station Rep.  And then up to that point, 1999, I became

6    Sergeant at Arms with the STFA and then the other

7    positions that I noted up until the present.

8         Q     Can you just run through from Sergeant at

9    Arms, and again I am putting you on the spot with a lot

10   of history, but if you can do it just for the record

11   I'd appreciate that.

12   A     That's okay.  From 1999 to mid 2000, Sergeant at

13   Arms.

14        And then in 2001 I was moved into the position

15   of First Vice President for a short period of time.

16        Then I then took over the duties of the Vice

17   President for Legislation and Grievances and at that

18   time I was in that position for several years handling

19   more discipline effecting our members be it reprimands,

20   summary disciplinary hearings, general disciplinary

21   hearings and working with our association attorneys on

22   all those cases for a number of years.

23        There were approximately, from my recollection,

24   over 400 pending grievances at that time that we worked

25   on getting resolutions to.

1      Then after that position, I held the position of

2   Second Vice President for a period of time.

3      And then approximately 10 years ago I was

4   elected into the position of First Vice President for

5   the STFA and I held that position continuously up until

6   January 1st, 2012.  I believe that covers the entire

7   timeframe.

8      Q    So 25 years of experience?

9   A    Yes.

10     Q    Very good.  Thank you.  As STFA

11  President, are you involved in pending OPS matters

12  pertaining to the STFA members and if you can you

13  explain how?

14  A    Yes.  I am.  All communications from the

15  Colonel's Office, from this Office of Professional

16  Standards, more specifically with the Adjudication Unit

17  and dealing with our members in regard to any pending

18  matters whether it be requesting Weingarten

19  representation for impending internal interviews as

20  principals or witnesses and also dealing with discovery

21  for the proper representation of our members.

22     There is -- there was and is a conduit to make

23  sure that our members and our respective association

24  attorneys have full discovery for preparation of any

25  negotiation or adjudication of any disciplinary matters

1    involving our members.

2           Q      Are you personally involved in the

3    matters, I mean, as the President were you?

4    A      Yes.  I am.

5           Q      How?

6    A      In my role I have the authority to have

7    discussions with my association counsel and with the

8    members regarding these matters as they move through

9    the process.

10          Q      Okay.  Do you act as an advisor in some

11   way in any of these matters?

12   A      I would say that in the capacity of my role is

13   to obtain the satisfactory outcome for all parties for

14   any pending matter that's mutually beneficial to all.

15   More specifically, for my member the -- to get the best

16   resolution possible for any matter that's out there.

17          Q      So you're looking to represent the member

18   and their interest?

19   A      Absolutely.  Yes.

20          Q      Do you personally represent troopers in

21   hearings?

22   A      I have.

23          Q      As the President, can you do that?

24   A      Not in the capacity of the President, but in my

25   other roles as -- the other Vice President roles that I

1    have had I represented members in hundreds of minor

2    disciplinary hearings that would involve up to five-day

3    suspension.  I've also been a resource -- resource

4    person in summary and general disciplinary hearing

5    matters which we have -- the association counsel

6    usually has the lead in those more serious matters.

7        We also had -- we also have association counsel

8    involved in minor disciplinary matters as well but

9    there are situations that with minor or disciplinary

10   hearing matters that we and I have handled what we call

11   phase one hearings for members where we are the

12   representative for that member up through the process

13   and if we do get to a place where we need association

14   counsel, of course we will request their services.  But

15   I have done that role hundreds of times.

16       Q     Can you identify your staff by name and

17   title if you recall at this time.

18   A     My elected officers?

19       Q     Correct?

20   A     My First Vice President is Trooper I Mike

21   Zanyor.

22       My Second Vice President is Acting Sergeant

23   Daniel O'Brien.

24       My Vice President for Legislation and Grievances

25   is Trooper II Wayne Blanchard.

1    My Treasurer is Trooper I Frederick Hatrak.

2    My recording Secretary is Detective I Kenneth

3    Lutz.

4    My Correspondence Secretary is Trooper II Steven

5    Kuhn.

6    I have two Sergeants at Arms, Trooper William

7    Legg and Trooper Richard Monodragon.

8    I also have a Secretary of Resolutions Trooper

9    Daniel Olivera.  That would make 10 officers and I

10   include myself.

11   Q    Very good.  Thank you.  Does the STFA

12   provide support and legal services to STFA members

13   during OPS proceedings, support services and/or legal

14   services?

15   A    Yes.

16   Q    Can you describe or explain.

17   MR. BUKOSKY:  I'm going to object to that

18   question.  I mean, the Attorney General's Guidelines

19   indicates that any questions, and I'm quoting from

20   Section 11-43, "Any questions asked of officers during

21   an internal investigation must be narrowly and directly

22   related to the performance of their duties".  It also

23   goes on to indicate that, "Officers cannot be forced to

24   answer questions having little to do with their

25   performance as law enforcement officers or questions

1    unrelated to the investigation".  We think the

2    internal operations of the union and how that conducts

3    itself has nothing to do with his performance of his

4    duties and has little to do with this investigation.

5    So I strongly object to those questions as violating

6    your own internal affairs' policies and procedures of

7    the Attorney General Guidelines.

8              MR. RIZZO:  That would probably have some

9    application except for the fact that he's claiming the

10   attorney-client privilege as a result of his position

11   with the union as the President protecting him from

12   revealing sources or discussing things.  So the fact

13   that he is the President and hides behind it or uses it

14   as an explanation for the actions he has taken, makes

15   it to me a subject matter of the investigation in order

16   to know what it is that he does to confirm that he has

17   the role he claims he does or doesn't have, the role he

18   claims he does.  Because this is not, and I think you

19   will agree with this, the typical internal

20   investigation.  So it's been raised to a totally

21   different level by the attorney-client privilege

22   assertion made by your member.

23             MR. BUKOSKY:  We should, I think, ask

24   questions about the investigation, not about the

25   internal operations of the union.

1          MR. RIZZO:  But it's the internal

2     operations of the union that he says cause him not to

3     be able to discuss these things behind which he says he

4     has an attorney-client privilege so they are central to

5     whether or not there is such a privilege and whether or

6     not in his activities he violated internal rules of the

7     State Police.

8          MR. BUKOSKY:  I can't agree with the broad

9     scope of your characterization.

10          MR. RIZZO:  Well, you put your objection

11     on the record, but I don't think you can stop the

12     Sergeant First Class Harkness from asking his

13     questions.  Your objection is noted obviously.  Go

14     ahead.

15          MR. HARKNESS:  Continue?

16          MR. RIZZO:  Yes.

17          MR. BURGOS:   Can you repeat the question,

18     please.

19          MR. RIZZO:  She can read it back for you

20     if you want to do that.

21          (At which time, the reporter reads back

22     the last question.)

23     A     Yes.

24     BY MR. HARKNESS:

25          Q     Can you describe and explain how and how

1    that occurs?

2    A     Well, we have agreements with many licensed

3    attorneys throughout the State to provide legal

4    services to our members in good standing if they do so

5    require same for any disciplinary matter involving

6    their duties as a State Trooper and we make

7    arrangements for those services to be provided and with

8    the client -- the trooper and the STFA is the client

9    with the respective counsel that we have an agreement

10   with.

11        Q     Okay.  Does the STFA hire, I don't know

12   the correct legal term, hire or contract with a list of

13   attorneys?

14   A     We have agreements with respective attorneys

15   that we work with and yes, we do.  We do have that

16   understanding and we do pay the legal fees for those

17   services for those members.

18        Q     Is it -- is the list of attorneys pretty

19   much the same people?  Is it a standard list or do you

20   just reach out and hire anybody off the streets?

21   A     That's an internal process that's entirely

22   within the scope of my authority of my executive board.

23        Q     Okay.  That leads me to my next question.

24   How are you involved in that process?

25   A     My role --

1          Q          Specifically how are you involved?

2     A          To have direct contact with those attorneys with

3     the respective clients and to give them the ability to

4     properly represent the member through the agreements

5     that we have with them.

6          Q          Do you act as a conduit or go-between the

7     trooper and/or his attorney?

8     A          That is a role that I play.  Yes.

9          Q          And describe what you have done in the

10    past.  Just give us several examples if you can recall.

11    A          Any member that has any either pending

12    disciplinary matter or matter that has now been decided

13    upon to be discipline in nature that the members are

14    aware that as members in good standing that there is a

15    plan in place that upon request from that member we

16    will make a determination as to the eligibility to have

17    legal services provided to that member through our

18    legal plan, the STFA legal plan.

19         Q          Okay.  Throughout your STFA tenure, did

20    you ever sign a confidentiality agreement with the

21    Division?

22    A          No.  I did not.

23         Q          Did you ever sign a confidentiality

24    agreement as -- with OPS in any title that you held in

25    the past?

1       A       No.   I did not.

2               Q       As part of your union duties as President,

3       is confidential OPS information routinely disclosed to

4       you?

5       A       The term confidential I would classify as

6       discovery for disciplinary matters.   I see that as

7       discovery as far as there is nothing that said

8       confidential that I'm aware of on any documents that

9       I've dealt with.

10              Q       Do you consider OPS information to be

11      confidential, I guess, that's a pretty --

12      A       I would agree that yes, it is confidential

13      within the scope of working with counsel and the

14      affected member.   Yes.   That is correct.

15              Q       Does the union have a written policy

16      regarding maintaining confidentiality with OPS

17      information it receives?

18      A       We have an understanding with the Division of

19      the sharing of discovery with respective members and

20      the STFA attorneys.

21              Q       You say it's an understanding.   Is that in

22      writing anywhere?

23      A       I do not have anything in writing.

24              Q       Are you aware of that with any of your

25      experience having a written document along those lines?

1      A      I do not have that.  No.

2          Q      What instructions regarding OPS

3    confidentiality, I am speaking to you as the President,

4    are disseminated to the union officers and station

5    representatives regarding OPS confidentiality?

6    Specifically, what instructions do they -- do you

7    disseminate or your officers?

8      A      That any discovery for any pending matter is

9    specifically for that member as the client, the

10   association counsel and myself and any officer that I

11   deem necessary to be a resource person for those

12   matters.

13         Q      I guess what I am trying to do is, I'm

14   trying to dial down on say the average, I don't want to

15   use that word, but the average trooper who is

16   representing another trooper in an OPS matter as a

17   station rep, what directions do they receive?  What

18   understanding are they expected to adhere to?  Is there

19   anything in writing?

20     A      My station representatives would not deal in any

21   handling of any documents.

22         Q      But as far as the interviews, sitting in

23   the interview, I noted that they do take reports.  What

24   do they do with those reports?

25     A      You're regarding to the role as the Weingartner

1      representative under the Weingartner rule?

2           Q      Correct.

3      A       Yeah.  But the notes that are taken that are to

4      be kept in confidence within the association office and

5      only to be used for further review or needed at a later

6      time relevant to that matter only.

7           Q      Okay.  Are you aware if you're bound by

8      SOP to consider confidentiality, OPS confidentiality?

9      A       That's a matter of course that documents that

10     are internal in nature for the use of the Division

11     and/or the processes that we work with, obviously I am

12     not going to divulge that to the public for whatever

13     reason I deem.  That's not my decision to make it

14     public.  We did deal with it within the confines of our

15     counsel and the affected members.

16          Q      Are you ever in receipt of any legal memos

17     from OPS?

18     A       I believe I've seen memorandums as part of

19     discovery packages.

20          Q      Can you identify what you have seen

21     regarding that line?

22     A       Many many times as part of discovery for

23     disciplinary hearings for preparation, there have been

24     memos included in discovery packages many times.

25          Q      Can you identify your Division E-Mail

1      address for the record, please.

2      A      LPP4276hewnjsp.org.

3             Q      Okay.  And your STFA E-Mail?

4      A      Cburgos@stfa.org.  And I also have

5      President@stfa.org.

6             Q      Okay.  What is it again, I'm sorry?

7      A      President@stfa.org.

8             Q      Can you identify out of those E-Mails

9      which ones you use for STFA business.

10     A      Only the STFA E-Mails.  I do not use the

11     group-wide E-Mail for any association business.

12            Q      For the record, can you explain your

13     relationship with Vincent Nuzzi, Esq., please.

14     A      He is an authorized STFA legal defense

15     assistance plan attorney.

16            Q      And when did you first become to know him

17     or interact with him?

18     A      I would say at least over a dozen plus years

19     going back to at least 2000.

20            Q      Okay.  2000.  Did he represent you on

21     August 16th, 2012?  You, not the union, on August 16th,

22     2012, that's the date of this particular E-Mail?

23     A      He did not represent me personally.  Is that the

24     question?

25            Q      Yes.

1    A      He is not my personal attorney at that time.  He

2    was the STFA attorney assigned to a client and I'm the

3    client also.

4         Q      You're the client of what?

5    A      I'm the client as the STFA President with

6    Counsel Nuzzi in addition with the client trooper.

7         Q      Has he ever represented you in any past

8    cases personal or State Police business?

9    A      No.

10        Q      Can you explain your relationship with

11   Katherine Hartman, Esq.

12   A      She's also an authorized STFA legal defense

13   assistance plan attorney.

14        Q      Do you recall the date when you first met

15   her or interacted with her?

16   A      It would be the same going back to at least

17   2000.

18        Q      Did she represent you on August 16th,

19   2012?

20   A      No.  She was representing one of my members.

21   And as I said, with Counsel Nuzzi she has a

22   trooper/client and I'm also the client as the President

23   of the STFA for and with her firm.

24        Q      Did she ever represent you personally or

25   professionally?

```
 1    A      No.

 2         Q      Can you explain in detail your

 3    relationship with Lieutenant Dan Fisher, Badge 5150.

 4    A      Specifically at what point in time?

 5         Q      Identify, I guess, let's go way back from

 6    when you first met him.

 7    A      I believe going back to the year 2000 or so,

 8    best I can recall that, through the interactions with

 9    the Office of Professional Standards and dealing with

10    pending disciplinary matters, and his role more or less

11    was to put a package together for any member's

12    disciplinary matter that would be shared with the

13    affected trooper and with us to prepare a defense or

14    negotiated settlement.

15         Q      Do you consider yourself a personal friend

16    of Lieutenant Fisher?  First of all, identify my

17    version.  Say do you go to dinner or drinks or you

18    socialize after work?

19    A      No.

20         Q      And you only met him in his duties as an

21    OPS member; is that correct?

22    A      Yes.

23         Q      Did you know him say when you were on the

24    road together or anything like that in Troop B?

25    A      No.
```

1    Q      This particular E-Mail I showed you

2    earlier, the one from August 16th, 2012, at 9:56 a.m.,

3    did you receive that E-Mail from Katherine Hartman on

4    that particular date?

5    A      Best I can recall that would be the same date.

6          Q      You identified that as your particular

7    E-Mail in the CC?

8    A      Yes.

9          Q      Can you just state it for the record.

10   A      Cburgos@stfa.org.

11         Q      For the record, I am going to read this

12   E-Mail into the record.  "One, the document doesn't

13   relate to Louis at all.  Second, is an order granting a

14   45 extension to the Colonel for his decision.  This

15   system isn't rigged much, is it.  Take care.  Katy".

16   It's signed by Katherine D.  Hartman, Esq., attorneys

17   Hartman, Charter.

18              MR. BUKOSKY:  I just want to -- for the

19   record, I object to him reading that into the

20   statement.  That's a confidential attorney-client

21   privilege communication.  The fact that he just read it

22   into the record does not destroy the privilege.  We

23   understand that to be protected communication.

24              MR. RIZZO:  Okay.  That's fine.

25   BY MR. HARKNESS:

1      Q    Sir, did you receive this particular

2  E-Mail in response to something you sent to her?

3           MR. BUKOSKY:  It is my continuing

4  objection.

5  BY MR. HARKNESS:

6

7      Q    Was this --

8           MR. RIZZO:  You can ask the question.  He

9  is just putting it on the record to preserve.

10         MR. HARKNESS:  Is he obligated to answer

11  or no?

12         MR. BUKOSKY:  Are you ordering him to

13  answer?

14         MR. RIZZO:  Yes.

15  A    I don't know if that was a request or not.

16      Q    Okay.  Did you receive this E-Mail in

17  response to something you sent to Katherine Hartman?

18  A    I don't know.  It could be.  I'm not sure.

19  BY MR. HARKNESS:

20

21      Q    Okay.  So you're not sure if it was

22  spontaneous that you received it?

23  A    It may have been.  I'm not sure if it was

24  something that I asked for or she sent to me.  I don't

25  know that at this time.

1      Q      Okay.  I already put the E-Mail on the

2   record.  So what I'd like to introduce now are the two

3   attachments that were with that particular E-Mail.  I

4   introduced them earlier so I am not going to do it

5   again.

6         This particular Order of Extension, it is

7   identified or in the interest of Detective II Louie

8   Freites, his Badge 6352.  Did that particular matter

9   involve you as the STFA President?

10  A      Yes.

11     Q      How?

12  A      It was a pending disciplinary matter that --

13  what that document shows is that there was additional

14  time requested by the Superintendent to give a final

15  determination on a recommendation from the Office of

16  Administrative Law for the Superintendent to have more

17  time to come up with a final decision on the

18  Detective's disciplinary matter.

19     Q      Okay.  Was that unusual for you to

20  receive this type of document from Katherine Hartman or

21  any other union attorney?

22  A      No.  Not at all.

23     Q      This particular document?

24  A      Correct.

25     Q      Okay.  The second is the eight-page

1    attachment I put on the record earlier.  I am not going

2    to repeat it.  It is the review sheets just for

3    clarification.  Did this particular matter involve you

4    in any way as the STFA President?

5    A     Yes.

6          Q     How?

7    A     It involves Trooper Juckett who was one of my

8    STFA members being represented by counsel in a pending

9    disciplinary matter.

10         Q     Okay.  And what was your actual

11   involvement beyond generic?  What did you do in this

12   particular case?

13   A     I saw there was additional discovery that Mr.

14   Nuzzi had been requesting and forwarded same to him for

15   his use.

16         Q     In this particular matter or either matter

17   that we have put on the record, were you involved as

18   say as a principal and/or a witness in either matter?

19   A     No.

20         Q     In either of these two particular

21   investigations?

22   A     No.

23         Q     Were you expecting to receive this

24   particular E-Mail from Katherine Hartman?

25   A     That's a hard question to answer because when

1    dealing with counsel there is things that -- am I

2    expecting something?

3         Q      This one in particular?  This one in

4    particular with these two documents, were you expecting

5    to receive this from Katherine Hartman on that

6    particular date?

7    A      I wouldn't recall that that be the case, but I

8    don't recall if I was expecting that or not.

9         Q      Did you -- did any person enlisted and/or

10   civilian advise you this E-Mail was being forwarded to

11   you with these particular documents?

12   A      No.

13        Q      Did you receive any telephone calls about

14   that particular E-Mail prior to receiving it from

15   anybody?

16   A      No.

17        Q      Did you receive a phone call from

18   Lieutenant Fisher about that particular E-Mail and

19   these two documents?

20   A      No.

21        Q      Did you receive a phone call from any

22   other OPS member about that particular E-Mail and those

23   two documents prior to receiving it on the 16th of

24   August?

25   A      No.

1        Q      Are you sure?

2   A      Best I can recall.

3        Q      Okay.

4   A      I don't believe so.

5        Q      I'm going to turn your attention to the

6   review sheets.  Did you believe that the review sheets

7   attachment was sent out by Lieutenant Fisher by

8   mistake?

9   A      What I know now or at that time?

10        Q      At that time?

11   A      A mistake by sending it to Katherine Hartman,

12   yes.

13        Q      How?  How would that be a mistake?

14   A      Because she doesn't represent my member in this

15   case.

16        Q      Okay.  Can you identify --

17   A      My member Trooper Juckett.  Mr. Nuzzi represents

18   Trooper Juckett in this matter.

19        Q      Are you aware of any other members in this

20   particular case and who their representative is as

21   well?

22   A      As far as Sergeant Wambold would be Mr. Charles

23   Sciarra.  He's the noncommissioned officer's counsel

24   for Sergeant Wambold.

25        Q      Sir, you indicated before that you

1    believed the fact that Katherine Hartman received this

2    was a mistake?

3    A      Yes.

4         Q      Had you ever received this type of

5    document before in your position at any time with the

6    union?  This particular type of document, had you ever

7    received anything like that in the past?

8    A      Yes.

9         Q      When?

10   A      Many times representing members in disciplinary

11   hearings.

12        Q      This particular document, New Jersey State

13   Police Internal Investigation Review Sheet?

14   A      Sure.

15        Q      Can you identify a case?  Try to be as

16   current if you can so we can --

17   A      I couldn't name a case off the top of my head.

18   I have done hundreds of cases.

19        Q      And how many of these particular review

20   sheets have you received in those hundreds of cases?

21   A      I couldn't give you an exact number.  We have an

22   ongoing dialogue for additional discovery all the time

23   to provide full discovery and many times we don't get

24   full discovery.

25        Q      Is this part of your expectation of full

1      discovery?

2      A       I would expect that.

3              Q       Okay.

4      A       Absolutely.

5              Q       And said you received this.  Again, how

6      many times in the hundreds of cases you have been

7      involved in?

8      A       Many times.  I don't have an exact number.

9              Q       Would you be -- are these kept on file,

10     the discovery kept on file with the STFA?

11     A       No.  Once we are done with the case, they are

12     returned to the Division.

13             Q       Who do you return them to?

14     A       Office of Labor Relations.

15             Q       So they sit on file with them?

16     A       I don't know what they do with them but once we

17     are done with the case and it's adjudicated we return

18     the discovery back to them.

19             Q       So if I check with the Office of Labor

20     Relations, would I find this particular document in a

21     package that you had in your possession at one time or

22     somebody in the union at one time, this type of

23     document, this exact document?

24     A       I have no idea.  The latest information I got

25     from that office several years ago was that they

1    destroyed everything once I gave it to them.  I don't

2    know if that's the case or not or how they retain them.

3    I have no idea.

4           Q       Just again I will ask you one more time,

5    can you identify for the record the last case, the most

6    recent case that you received this particular document

7    as part of a discovery package?

8    A       I can't give you a specific case.  There's too

9    many.  There's too many cases.

10          Q       Okay.  How often do you communicate with

11   Katherine Hartman through E-Mail?  How often?  Is it a

12   daily occurrence?

13                  MR. BUKOSKY:  Objection.  That's a

14   privileged communication, the amount.

15                  MR. RIZZO:  All he's asking is the amount.

16   He is not asking for the content of anything.

17                  MR. BUKOSKY:  That discloses the degree of

18   their relationship.  I object.  If you are ordering him

19   to answer, you can order him.  But we understand that

20   to be a privileged communication.

21                  MR. RIZZO:  He is ordered to answer.

22   A       Often.

23   BY MR. HARKNESS:

24

25          Q       Often as in daily?

1    A      Possibly.

2          Q      Okay.   I have a follow-up question on the

3    prior line of questioning.   In any of the disciplinary

4    matters against troopers, are you also named as a party

5    as the President of the STFA?

6          MR. BUKOSKY:   I'm going to object to that

7    question.   I don't understand it.   I don't know if the

8    witness does.

9          MR. RIZZO:   It doesn't matter if you

10   understand.

11         MR. BUKOSKY:   Well, it's not clear.

12   BY MR. HARKNESS:

13

14         Q      I will reread it.   In any of these

15   disciplinary matters against troopers, are you also --

16   are you also named as a party as the President of the

17   STFA?

18   A      I am not named as a party, the STFA itself or

19   myself individually.

20         Q      As the President?

21   A      No.   I am not being charged with anything in

22   these cases.   I am representative of the member.

23         Q      Is the STFA named as a party in the

24   disciplinary action?

25   A      On each individual one?

1    Q      Yes.

2    A      The answer would be no.

3         Q      In her message Katherine Hartman

4    indicated, again you can keep it for your review if you

5    want, in her message Katherine Hartman indicated one of

6    the attached documents didn't relate to her client but

7    she still forwarded both to you.  When you received the

8    OPS Supervisory Review Sheets, why didn't you

9    immediately notify OPS and return them to Lieutenant

10   Fisher especially since you represent you received them

11   as a result of Lieutenant Fisher's mistake?

12   A      I don't see that as my responsibility.  My

13   responsibility is to represent the member with proper

14   discovery.  That was my understanding that this was

15   additional discovery.  I am not to be calling this

16   office in that regard.  I don't see that as an

17   obligation of mine.  It was additional discovery that

18   was requested for this matter and I saw that we had

19   received it.  Even though it went to a different

20   attorney, I got it to the right attorney.

21        Q      Were you aware of the review sheets did

22   not concern the Freites' OAL case?

23   A      Yes.

24        Q      You did read them?

25   A      I reviewed it.  Yes.

1  Q  Do you recall the first time you saw a New

2  Jersey State Police Internal Investigation Review

3  Sheet, the first time over your 25 years of being

4  involved in the STFA?

5  A  That's going back to the time I was handling

6  these matters over a dozen years ago.

7  Q  Okay.  Had you had any discussions with

8  anyone regarding receiving this particular review sheet

9  with anyone?

10  A  No.

11  Q  Any OPS member?

12  A  No.

13  Q  Any STFA member?

14  A  No.

15  Q  Any union attorney?

16  A  Yes.

17  Q  And who would that be?

18  A  Hartman and Nuzzi.

19  Q  Okay.  Prior to receiving that document

20  through Ms. Hartman, were you aware if Vincent Nuzzi

21  desired to have the review sheets for any specific

22  investigation including this one?

23  A  In the context of full discovery, yes, he had

24  made numerous requests through DAG Victor DiFrancesco

25  for additional discovery.

1   Q  Did he specifically identify these sheets

2 as discovery he desired, these in particular?

3 A  Described as any and all documents pertaining to

4 the matter, and that would include anything as we are

5 talking about here, this review sheet, yes, that's part

6 of any and all documents.

7   Q  So you're aware that he specifically

8 desired to have these particular review sheets in his

9 custody; is that correct?

10 A  Absolutely.  Yes.

11   Q  Before you received them?

12 A  Yes.

13   Q  And when was that?  When did you have that

14 conversation?

15 A  It was at some point before the receipt of

16 these, there was an ongoing dialogue with Mr. Nuzzi and

17 Mr. DiFrancesco on getting full discovery and

18 additional documents.

19   Q  And what person identified these as being

20 relevant full discovery that would be released?  What

21 person in that three-person conversation?

22 A  I don't know.  I don't know.

23   Q  In other words, who brought it up?

24 A  You have to ask Mr. Nuzzi or Mr. DiFrancesco in

25 regard to that because there was ongoing communications

1    between them, I believe there still are, regarding full

2    discovery on this matter.  I believe you have -- the

3    State has a certification from Mr. Nuzzi to that

4    effect.

5        Q      After you received this particular

6    document on the 16th, August 2012, did you speak with

7    Mr. Nuzzi prior to forwarding the review sheets to him?

8    A      No.

9        Q      You didn't call him?

10   A      No.

11       Q      Did you call anybody else?

12   A      No.

13       Q      Did you speak to anybody else in the

14   office?

15   A      No.

16       Q      Why did you forward the review sheets to

17   Mr. Nuzzi in this particular matter, this particular

18   document?

19   A      It was additional discovery that had been

20   requested by Mr. Nuzzi through Mr. DiFrancesco, routine

21   discovery that we always requested.

22       Q      After you sent these documents to Mr.

23   Nuzzi, did you have a conversation with him?  Did you

24   discuss the fact that you had these and where you got

25   them and so on and so forth?

```
 1      A      At some point, yes.

 2           Q      And when was that?

 3      A      I can't remember at this time.  It's going back

 4      over --

 5           Q      Did you call him right after -- we'll get

 6      to it.  I'll back up.  What did you say to him when you

 7      spoke to him?

 8                  MR. BUKOSKY:  Objection.  That's

 9      attorney-client privilege.

10                  MR. RIZZO:  That's okay.

11      BY MR. HARKNESS:

12

13           Q      When you indicated to Mr. Nuzzi when you

14      spoke to him, did he request these from you or did you

15      offer them up to him without a request?

16      A      They were sent to him as I explained earlier.

17           Q      How did you forward the documents to him?

18      A      Via E-Mail.

19           Q      Which E-Mail address was that?

20      A      Whose E-Mail?

21           Q      Yours?  Which one did you use?

22      A      My STFA E-mail.

23           Q      Which one?

24      A      Cburgos@stfa.org.

25           Q      Do you know when you did that?  Do you
```

1    recall when you did that?  If this was at 9:56 a.m.,

2    when did you forward them to him?

3    A      I believe that day, that same day.

4          Q      Do you recall what timeframe?

5    A     I don't know.  I can't recall.

6          Q      Did you forward these -- the review sheets

7    to anyone else besides Mr. Nuzzi?

8    A      No.

9          Q      No one else?

10   A      No.

11         Q      Did you discuss the review sheets with

12   anyone either before or after contacting Mr. Nuzzi

13   about the review sheets?   Did you discuss them with

14   anybody else?

15   A      No.

16         Q      No?

17   A      No.

18         Q      In your E-Mail account, is this particular

19   E-Mail still archived in your STFA E-Mail at this time?

20   A     I'm not sure.

21         Q      Did you delete this E-Mail, the E-Mail?

22   A     I don't know.

23         Q      You don't know?

24   A     I don't know at this time.  No.

25         Q      Are either attachment archived in your

1    E-Mail or in any STFA computer as we speak?

2    A      It may be.

3        Q      The extension may be?

4    A      Yes.   It may be.

5        Q      And the review sheets may be?

6    A       Correct.

7        Q      What computer would they be on possibly?

8    A      My STFA computer at my office.

9        Q      Is that a laptop or a --

10   A      It's a desk computer.

11       Q      A desk computer.   At any time did you --

12   you're saying you didn't delete the E-Mails then?

13   A      I don't recall if that was the case or not.   I

14   have thousands of E-Mails.

15       Q      For the investigation, can you reproduce

16   the E-Mail for this particular matter?

17              MR. BUKOSKY:   You're asking for us to

18   supply it?

19              MR. HARKNESS:   Correct.

20              MR. BURGOS:   It's an attorney-client

21   communication.

22              MR. HARKNESS:   Correct.   Reproduce it and

23   then provide it.

24              MR. BUKOSKY:   Well, we understand it to be

25   an attorney-client communication that's privileged.   He

1    indicated that he sent it to Mr. Nuzzi.  What he said

2    and how he said it is privileged.

3                    MR. RIZZO:  So you're refusing to provide

4    it?

5                    MR. BUKOSKY:  If he is being ordered to

6    provide it, he will comply with any order.

7                    MR. RIZZO:  Then he will be ordered to

8    provide it.

9                    MR. BUKOSKY:  Okay.

10                   MR. HARKNESS:  The entire E-Mail chain

11   that's associated with this particular matter.

12                   MR. BUKOSKY:  We object but if he is

13   ordered, he's going to comply with the order.

14                   MR. RIZZO:  That's fine.  Your objection

15   is being preserved on the record but he is being

16   ordered to produce it as part of the OPS internal

17   investigation.

18                   MR. BUKOSKY:  If he can.  If he can.

19   BY MR. HARKNESS:

20

21        Q    Again staying on these documents, in

22   particular this document, the review sheets, are there

23   copies of those review sheets in existence anywhere

24   else besides your computer and to whoever you forwarded

25   them to?  Are they in existence anywhere else other

1    than a file?  Were they forwarded to anybody?

2    A      Maybe I would think they would be in the -- in

3    my file, the defense file for this case in my office.

4         Q      Is that a separate file or is that case

5    specific?

6    A      Case specific.

7         Q      Just a little follow-up, a little

8    clarification.  You discussed the issue of routine

9    discovery and this document in particular being an

10   expected part of that routine discovery.  What do you

11   mean by routine discovery?  I guess we need your

12   definition what you mean by that.

13   A      Any and all documents pertaining to a matter

14   representing my member in a disciplinary action.  I

15   don't see any communications relevant to my member's

16   discipline as being not part of discovery.  That's why

17   I request it.

18        Q      Do you know if Mr. Nuzzi, to your

19   knowledge, ever specifically requested supervisory

20   review sheets from Victor DiFrancesco?

21   A      I don't know that.

22        Q      You don't know?

23   A      No.

24        Q      Did you ever see a letter from Mr. Nuzzi

25   to Mr. DiFrancesco requesting supervisory review

1    sheets, a letter?  Did you ever see a letter related to

2    that?

3    A      I don't know.

4           Q      At any time did you forward the review

5    sheets to Mr. Charles Sciarra, Esq.?

6    A      Yes.  I did.

7           Q      How did you do that?

8    A      Via E-Mail.

9           Q      And when did you do that?

10   A      I believe that same day.

11          Q      Again, do you recall a time?  This was

12   9:56 a.m. in the morning.

13   A      At some time that day.

14          Q      Did you send them to Mr. Nuzzi first or

15   Mr. Sciarra first?  Do you recall?

16   A      I believe Mr. Nuzzi and then Mr. Sciarra.

17          Q      And why was that?  Was there any

18   particular reason why it was in that order?

19   A      No.  Well, Mr. Nuzzi is the attorney for my

20   member and Mr. Sciarra is the attorney for Sergeant

21   Wambold.

22          Q      Why did you send them to Mr. Sciarra?

23   A      He had made requests for additional discovery

24   also and I was aware of that.

25          Q      Do you know if Mr. Sciarra specifically

1   requested the review sheets in that particular matter,

2   09354?

3   A      I don't know that.

4        Q      You don't know.  Did you have a

5   conversation with him where he said he knew about these

6   and wanted them for his case?

7   A      No.

8        Q      Did you have a conversation with him where

9   he told you to expect these, you would receive them and

10  to expect to receive them?

11  A      No.

12       Q      Okay.  Was Mr. Sciarra representing you

13  personally at the time you forwarded the review sheets

14  to him?

15  A      No.

16       Q      Had he ever represented you in any

17  personal or professional matter?

18  A      Yes.

19       Q      Can you identify?

20  A      They were matters against the STFA and he

21  represented myself and the STFA.

22       Q      Can you tell me how recent that was?

23  A      It goes back a couple years.

24       Q      So 2010?

25  A      I don't know exactly.

1         Q      But since that time he hasn't specifically

2    represented you?

3    A      No.

4         Q      And you were not a witness or a principal

5    in this particular matter 2009-0354?

6    A      No.  I was not.

7         Q      You were not officially involved in it in

8    any way?

9    A      No.

10        Q      Regarding specifically these review

11   sheets, did you ever agree to speak to any members of

12   the press about the content of those review sheets?

13   A      No.

14        Q      Did you ever agree to speak off the record

15   to any members of the press regarding these specific

16   review sheets?

17   A      No.

18        Q      Are you aware if any State Police enlisted

19   member ever spoke to any member of the press about

20   these enlisted review sheets?

21   A      No.

22        Q      Did you print, reproduce, file or store

23   the review sheets anywhere we have not discussed?  It

24   doesn't matter what format it's in.

25   A      No.

68

1          Q         You haven't saved it to a disc or hard

2     drive or thumb drive or anything like that?

3     A       No.

4          Q         Is a copy available say off State Police

5     grounds say at your personal residence or anything like

6     that?

7     A       No.

8          Q         At any time did you print the review

9     sheets and copy them?

10    A       For my legal defense file at my office which I

11    stated earlier.

12         Q         And how many times did you copy the review

13    sheets?

14    A       Just one copy.

15         Q         One copy.  Did any of your other STFA

16    board members review these sheets?

17    A       Possibly Mike Zanyor as my First Vice President

18    because he is my legal defense plan administrator.

19         Q         That was his only involvement?

20    A       That's his role.  Yes.

21         Q         Did he get involved in distributing these

22    out to anybody either?

23    A       No.

24         Q         So it is just yourself and your Vice

25    President?

```
 1      A       Yes.

 2              Q        Anybody else?

 3      A       Nope.

 4              Q        Were there any other troopers in, I'll

 5      call it the station, in the office at the time you

 6      received this?

 7      A       No.

 8              Q        That you can recall?

 9      A       No.

10              Q        Do you have a sign-in sheet at the office?

11      A       No.

12              Q        Do you keep records of who visits?

13      A       No.

14              Q        Did you forward the review sheets in any

15      manner to any other person that we have not yet

16      discussed?

17      A       No.

18              Q        Did you discuss the review sheets with

19      anybody else that we have not yet discussed, anybody at

20      all in the Division?

21      A       No.

22              Q        Anybody who is a civilian and not employed

23      by the Division?

24      A       No.

25              Q        Did you desire to harm the NJSP by
```

1    forwarding the documents in any manner?

2    A    No.

3         Q    Did you think that forwarding the

4    documents may, in fact, harm the NJSP in any fashion?

5    A    I didn't have that opinion.  I was working with

6    counsel to appropriately defend my member with proper

7    discovery.

8         Q    Were you advised by any other member to do

9    so?  In other words, forward the documents because, in

10   fact, it may harm the NJSP?

11   A    No.

12        Q    Did any member caution you not to forward

13   the documents?

14   A    That conversation did not occur.

15        Q    What conversation?

16   A    There was no conversation to that effect.

17        Q    At any time did you contact Lieutenant

18   Fisher or any other member of AIPU here at OPS or any

19   other OPS member about these review sheets?

20   A    No.

21        Q    Did you have any follow-up conversation

22   through people to Lieutenant Fisher?

23   A    No.  I don't talk to Lieutenant Fisher anymore.

24        Q    Okay.

25   A    I haven't talked to him in a very long time.

1        Q        And why is that?

2        A        I don't trust anyone in this office so I can't

3        have conversations with them.

4        Q        And when did you start not trusting him I

5        guess?

6        A        When I became President.

7        Q        And again that was January 2012?

8        A        Yes.

9        Q        But up to that time you had a relationship

10       with Lieutenant Fisher?

11       A        We discussed how to solve cases.  I can't do

12       that anymore.

13               MR. HARKNESS:  Okay.  Sir, do you have any

14       follow-up question or any type of clarification you

15       would like to add?

16               MR. QUINOA:  Yes.

17       EXAMINATION

18       BY MR. QUINOA:

19

20       Q        When your members receive a discovery

21       package, do you routinely review these discovery

22       packages?

23       A        Yes.

24       Q        So you review every single sheet that's

25       given in discovery?

1   A       Every single sheet that's provided to us I do

2   review if at all possible.

3           Q       And you stated earlier that the internal

4   review sheets that's done by the supervisors has been

5   given to you in prior cases in discovery; is that

6   correct?

7   A       Yes.

8           Q       So this particular document, the internal

9   review sheets, you are stating that you have seen these

10  review sheets in all the discovery packages that have

11  been given to your members when charged?

12  A       That's not correct.

13          Q       Okay.  What is --

14  A       Not all.  I said many over the years.

15          Q       Can you give us a quantitative measure how

16  many is many?

17  A       I have done so many --

18          Q       Percentage, how is that?

19  A       Sir, I have done so many cases I couldn't give

20  you a percentage.  I did hundreds if not thousands or

21  more.

22          Q       More than half of the cases have contained

23  these review sheets?

24  A       My answer is many.  I am not going to lock into

25  a number I'm not sure of.

1        Q     It's not a number.  A percentage?

2    A    Many.

3    EXAMINATION

4    BY MR. HARKNESS:

5

6        Q    Do you recall the last OPS member who

7    provided your member, STFA member with that particular

8    document included in their discovery package?  Who was

9    the OPS member who actually released this to the best

10   of your recollection?  There is always a receipt.

11   A    You have to ask the people in the office across

12   the hall.

13       Q    There's always a receipt and your member

14   would get a receipt with that.  So do you recall --

15   A    You have to ask them.  They are the ones that

16   give it out.

17       Q    Well, I'm asking you.  Who was the last

18   member that you recall that released this particular

19   document in any OPS case?

20   A    Whoever was in adjudication at the time.  Dan

21   Fisher was the longest person that I have known that

22   was there.

23       Q    So you're saying Lieutenant Fisher has

24   released this before?

25   A    As a Sergeant.  That's his office.

1      Q      Okay.  Has anybody else that you are aware

2   of, any other member, that would be involved in that

3   which is AIPU, can you identify any other member who

4   with a receipt signed this particular document out in

5   your past history?

6   A      I can't.  I have no idea.

7      Q      So only Lieutenant Fisher in -- to the

8   best of your recollection?

9   A      I can't keep track of all the people that have

10  gone through that revolving door.

11     Q      So do you at least agree that everything

12  is signed out with a receipt on each package?

13  A      When it is shared with counsel?

14     Q      No.  From here?

15  A      When a member picks it up?

16     Q      Yes.

17  A      They have to sign a receipt.

18     Q      Is a copy of that receipt left with

19  your -- with the case on file with you or at least in

20  your possession until you turn it over to Labor

21  Relations?

22  A      The member is supposed to hold onto that.

23     Q      So do you have any cases right now, right

24  now, not old cases, in the last month or two, let's go

25  back to the summer of 2012, this time period, can you

1    identify any case that you're still sitting on that

2    doesn't have -- that hasn't been adjudicated where a

3    receipt shows that a member from OPS released these

4    with that particular investigation?  Do you have

5    anything like that on file right now that we can see

6    and verify?

7    A      I don't know.   I don't know.

8    EXAMINATION

9    BY MR. QUINOA:

10

11          Q      Trooper Burgos, you stated that many --

12   you stated earlier that you reviewed the discovery

13   that's given to a member; is that correct?  You review

14   that discovery you stated that for the record?

15   A      I try to.  Yes.

16          Q      You try to.  And you're familiar with the

17   Supervisory Internal Investigation Review Sheets and

18   you're stating that on many cases that is part of the

19   discovery that's given to your member; is that correct?

20   A      From what I have seen in the past.  Yes.

21          Q      So when you routinely are reviewing these

22   discovery sheets, have you ever made a request where

23   there wasn't a discovery sheet, a review sheet in the

24   discovery where you have told the attorney or the

25   member or advised OPS the review supervisory sheet has

1    now been included as part of the discovery, have you

2    ever made that request?

3    A      Sure we have.  We would request for this the

4    allegations and conclusions and other correspondence

5    regarding the discovery.

6           Q      So you're stating for the record that you

7    specifically have requested through either OPS or

8    through one of your attorneys to request this

9    particular document, the review sheets, that were now

10   given in discovery on prior cases, you specifically

11   made that, on any member where you saw that there was

12   no review sheets included in the discovery?

13   A      Any and all documents.

14          Q      Any and all documents, I'm talking

15   specifically about this document.  You reviewed the

16   documents.  You know what you're getting.  You

17   specifically stated that on many cases this document is

18   included in discovery.  When you reviewed the

19   discovery, that document is not included in that

20   package, have you made a request to OPS or through

21   attorneys specifically asking for this particular

22   document?

23   A      I would say yes.  Review sheets, allegations,

24   conclusions, notes.  Things of that nature.

25          Q      Thank you.  And the review sheets and

1    stuff you have requested it specifically for this

2    particular document?  I just want to be clear on the

3    record.  This is a document that you've described that

4    you received which is called, if I can see the

5    document --

6            MR. HARKNESS:  Sure.

7    BY MR. QUINOA:

8

9        Q    The New Jersey State Police Internal

10   Investigation Review Sheet.  You specifically have

11   looked for that in the discovery package, you noticed

12   it is not in the discovery package in other cases and

13   you specifically requested that particular document

14   from State Police because it was not included in the

15   discovery package?  That's a specific document, not any

16   document, not any and all documents?

17   A      I leave that to association counsel to make

18   those requests.

19       Q    Well, you said that you have reviewed

20   discovery packages, you're familiar with discovery

21   packages.  You said on many cases, and you refused to

22   give a number, but on many cases that has been part of

23   the discovery package that particular document.  So as

24   you're reviewing these, you notice that that is not

25   included in a particular discovery package, have you

1    asked anyone at OPS or advised counsel, hey, they did

2    not include the review sheets?

3    A    Yes.

4         Q    Okay.   And you have done that on many

5    cases?

6    A    I do that on every case.

7         Q    Where you specifically asked for the

8    review sheets when they are not included?

9    A    Through my confidential discussions with

10   counsel, that is correct.   Full discovery.

11        Q    I understand full discovery.   Specific

12   documents.   I understand what you said.   I don't think

13   there is any need for more clarification.   You're

14   stating that the review sheets that have not been

15   included in prior discoveries you have made a request

16   through legal counsel or perhaps on your own to get OPS

17   to provide that particular document in discovery in

18   prior cases?

19   A    I just answered the question.

20        Q    Can you answer it one more time.

21   A    Yes.

22             MR. QUINOA:   Thank you.

23             MR. HARKNESS:   That's all you have, sir?

24             MR. QUINOA:   That's all I have, sir.

25             MR. HARKNESS:   Mr. Bukosky, is there

1    anything you would like to add or any questions you

2    would like clarified or anything at this time?

3                    MR. BUKOSKY:  No.  Other than it's clear

4    to me that all the questions that were asked today only

5    pertain to our internal union affairs.  It has nothing

6    whatsoever to do with your investigation of whatever

7    document that you're concerned about.   As indicated,

8    this is a routine discovery document.  Why we are

9    having an investigation over routine discovery

10   documents, I don't know, but it's clear to me it has

11   nothing whatsoever to do with the performance of

12   Officer Burgos' duties and responsibilities and the

13   questions were not narrowly directed to his performance

14   of his duties.  They were solely related to his union

15   duties.   My continuing objection, you know, because of

16   a variety of reasons to this whole investigation, it

17   violates the Internal Affairs policies and procedures

18   of the Attorney General's guidelines, Section 11-43.

19   It violates the attorney-client privilege.  It violates

20   the First Amendment on the Freedom of Association.

21   And I just think this was a very inappropriate

22   investigation.  Nothing further.

23                    MR. QUINOA:  Sir, if I may, if these are

24   routine discovery documents, they are current cases

25   that are ongoing with Mr. Burgos' office, can Mr.

1    Burgos please provide us with current cases, okay,

2    where this office, OPS, has given the review sheets as

3    part of discovery as he represents?  So the number of

4    cases that he currently has in his office, we'd like

5    him to go through his discovery package, okay, and tell

6    us on which case this document, this particular

7    document has been given in discovery, current cases and

8    then we'll be able to get exactly how many are --

9                 MR. BUKOSKY:  No.  He is not going to do

10   your secretarial work.  These are documents released

11   from your office and you can go through your receipts

12   and see when the documents have been given out.  He is

13   not to go routing through hundreds and hundreds of

14   files wasting his time to do research that you can do.

15   So I object to him having to do that.  That's improper.

16                 MR. RIZZO:  If he's ordered to do so, he

17   will do so.  And in addition to going through them and

18   looking for any such internal supervisory review

19   document that might have been provided, also a copy of

20   any letter from him or from an attorney representing

21   that particular trooper demanding to see that

22   Supervisory Internal Review Sheet because it wasn't

23   included in the discovery package.

24                 And I might add, and contrary to what your

25   statement was, this whole investigation centers on a

1    document that is never provided in any routine document

2    discovery package to any trooper that's suffering or

3    undergoing discipline.  This is unusual by 100 percent

4    and that's exactly why this investigation is being

5    conducted.

6         MR. BUKOSKY:  Well, I'm indicating you

7    need to issue him a written order to go through these

8    files and we'll bring it up before Judge Sheraton

9    because we are not going to do your secretarial work.

10   You can get those documents.  You maintain them and for

11   you to have him conduct your own investigation, that's

12   just not going to happen.

13        MR. RIZZO:  I understand what you're

14   saying.  The point is, these documents are never

15   provided.  He says they are routinely and/or they are

16   demanded when they are not.  He is going to get a

17   written order to produce all of that material and the

18   reason being is that it is never produced in a

19   discovery package.  So you can bring it up before Judge

20   Sheraton but he's going to get a written order to that

21   effect.

22        MR. BUKOSKY:  Well, you're going to have

23   to talk to your own agencies because they apparently

24   destroyed all these documents so I don't know where you

25   think they are going --

1          MR. RIZZO:  Well, Mr. Quinoa specified

2     active cases that are currently with the union that

3     have not been adjudicated so they haven't been

4     destroyed.  They are sitting in his office.  That's

5     what he said.

6          MR. BUKOSKY:  If there are any.

7          MR. RIZZO:  He says they are.

8          MR. BUKOSKY:  No.  He did not say that.

9     He said there are many cases and they may or may not

10    be --

11         MR. RIZZO:  All of the ones that are

12    sitting there unadjudicated right now, if that document

13    exists, that internal review document and/or its been

14    demanded because it wasn't in there, he is going to get

15    an order to produce that material.

16         MR. BUKOSKY:  Send the order.

17         MR. RIZZO:  Okay.

18         MR. HARKNESS:  Anything else from anybody?

19    Trooper Burgos, anything else?

20         MR. BURGOS:   No.

21    EXAMINATION

22    BY MR. HARKNESS:

23

24         Q     Sir, has this statement been the truth to

25    the best of your knowledge?

1    A      Yes.

2          Q      Is there anything regarding this

3    investigation that I have not asked you that you feel I

4    should have?

5    A      No.

6          Q      Is there anything that you would like to

7    add to your statement at this time?

8    A      As I told the Chief of Staff and the Colonel's

9    Office, this is a witch hunt for obvious trying to

10   cover tracks for Star Ledger news stories that have

11   obviously caused some problems within the State of New

12   Jersey's Law and Public Safety and they are looking for

13   a scapegoat and that apparently is me.

14         Q      So you did have this conversation with

15   somebody in the Chief of Staff's Office about this?

16   A      Yes.  I spoke to the Chief of Staff.

17         Q      And what was the contents of that

18   conversation just for the record?  Because I asked you

19   about this earlier.  I asked you if you had any

20   conversations about this particular matter with anybody

21   in the State Police.

22   A      I'm sorry.  I didn't recall at that time.

23   EXAMINATION

24   BY MR. QUINOA:

25         Q      Can you identify the Chief of Staff just

1    for the record.

2    A        Patricia Littles.  I don't recall what rank she

3    is right now.  Major I think.   It goes back to

4    November 20th, 2012.  On or about that date I received

5    numerous requests for Weingarten representatives for my

6    members and I inquired as to why we have -- I have six

7    members calling for reps and they need to talk to these

8    members as soon as possible and trying to coordinate

9    reps was a priority.  We don't want to delay

10   investigations.   And I reached out to the Chief of

11   Staff about it and I actually tried to reach out to the

12   Colonel.  He was not taking my call.  I got a response

13   back from Chief of Staff Littles.  Is it important.  I

14   said, yes, it's important and I advised her that I

15   believe that I was the target of an investigation

16   regarding leaks and if it was regarding anything

17   regarding the Wambold-Juckett case, that obviously they

18   are looking for a scapegoat and this witch hunt is

19   targeting me.  And that conversation was had on or

20   about November 20th.  I expressed my dismay that I had

21   not received any return call or discussion with the

22   Colonel on this and I haven't had any discussions with

23   them since them.

24   EXAMINATION

25   BY MR. HARKNESS:

1     Q      And what was the content of the

2   conversation?

3   A      With the Chief of Staff?

4     Q      Exactly.  What was the content of the

5   conversation?

6   A      I said Lieutenant Dan Fisher's screw up has

7   caused a backlash against the association, myself and

8   my members.

9     Q      What did you identify as the screw up?

10  A      The discovery regarding the Juckett case.

11    Q      So you identified to her that you had, in

12  fact, that review sheet in your possession?

13  A      I said that I believe that this is in regard to

14  the Wambold-Juckett case.  If that's the case, if that

15  is the fact, that it's a witch hunt and I am being

16  scapegoated.

17    Q      Again, I'm trying to clarify here whether

18  she knew that you had those review sheets in your

19  possession and -- that's the first part of my question.

20  Did she know you had them in your possession during

21  that conversation on November 20th?

22  A      I don't know if she acknowledged that or not.

23    Q      Did you tell her?

24  A      I made clear that it was regarding discovery.

25    Q      You told her that you had them in your

1    possession?

2    A      This is November?

3          Q      Right.  November 20th.  What did she say

4    about that?

5    A      That she would relate my concerns to the

6    Colonel.

7          Q      Did you -- was she aware of the review

8    sheets?  I guess we can start there.  Was she aware of

9    the content of those review sheets?

10   A      I don't know.

11         Q      Did you tell her the content of the review

12   sheets?

13   A      I said it was discovery regarding

14   Wambold-Juckett.

15         Q      Did you tell her the content of the review

16   sheets meaning did you tell the Chief of Staff that the

17   review went through and the findings as to whoever the

18   findings were associated with, whatever person made

19   those findings, did you have that discussion with her?

20   A      No.

21         Q      Did you tell her what you were going to do

22   or what you did with the documents?

23   A      No.

24   EXAMINATION

25   BY MR. QUINOA:

1          Q       Trooper Burgos, if these documents -- you

2     stated numerous times that these documents were

3     routinely given out in discovery, the review sheets

4     were routinely given out in discovery, correct?  Why do

5     you consider Lieutenant Fisher's forwarding these

6     review sheets as a screw up?  If they were routinely

7     given in discovery, why would you consider Lieutenant

8     Fisher giving those documents as a screw up?  It

9     doesn't make sense.

10    A       That he sent it to the wrong attorney.

11         Q       So you're saying he sent it to the wrong

12    attorney is a screw up?  You're entitled to the

13    discovery you're saying?

14    A       Right.

15         Q       That you received this on all your

16    discovery packages or many of your discovery packages,

17    you receive this document.  So therefore if he sent it

18    to a different attorney, I don't see how you can say

19    that's a screw up?

20    A       If he sent it to the proper attorney, I would

21    never have seen these documents.  They would not have

22    been forwarded to me.  They would have been sent to

23    appropriate counsel.

24         Q       So you think there is a scapegoat because

25    the focus here is that Lieutenant Fisher sent this

1    routine package that you're claiming is in regular

2    routine packages that was forwarded to another

3    attorney, that is a major coverup or screw up that the

4    Office of State Police, Office of Professional

5    Standards is trying to coverup that a discovery -- that

6    a document was sent to a different attorney if the

7    document is routinely given in any matter?

8    A     No.  That wasn't my point is that because of

9    what Dan Fisher did, I have to answer to why he sent it

10   to the wrong counsel rather than the appropriate

11   counsel and the Star Ledger writes a story and all

12   these things start going on, that's what I am talking

13   about.  That's what everyone doesn't want to talk about

14   is that the media is driving all these issues and I'm

15   the appropriate scapegoat here because the truth hurts

16   sometimes.

17       Q     I don't want to beat this, but I just want

18   to make sure.  You're saying that the fact that

19   Lieutenant Fisher sent this discovery document that you

20   say you received many times, okay, that he sent it to a

21   different attorney, you're saying that that's the focus

22   of this investigation why this particular document was

23   sent to an attorney that was not representing, that's

24   the screw up, that's what they are trying to find out

25   why he sent it to the wrong attorney?

1        A        I can't answer that question.

2               Q        Well, you're saying it's a screw up.  Is

3        that the screw up you're talking about that --

4        A        That was my --

5               Q        What is the Office of Professional

6        Standards trying to cover up that you're saying in your

7        words or trying to put the blame on you?  Exactly what

8        are they trying to put the blame on you on exactly?

9        A        That the Ballis (ph) litigant, the

10       Wambold-Juckett case their counsel put things on the

11       record and it's embarrassing to the State and this

12       discovery is crucial to our member's defense and now

13       it's all -- its come to the point where because this

14       proper discovery was provided, it puts the State on its

15       heels so now it's our fault.  It's my fault.  It's my

16       attorney's fault that the State is in this position of

17       having to explain themselves why for years nothing was

18       done and then minds were changed on the day the Star

19       Ledger article comes out.  That's my concern.  And in

20       my eyes as the President, I have to properly represent

21       my members and I'm not going to be bullied for whatever

22       reason to just try to roll over and let things happen.

23       I'm going to do the right thing for my members.  Proper

24       discovery.  This is what we do.

25               MR. QUINOA:  Thank you.

1          MR. HARKNESS:  Anything else?

2          MR. RIZZO:  I have nothing.

3          MR. HARKNESS:  Sir?

4          MR. BUKOSKY:  Nothing.

5     EXAMINATION

6     BY MR. HARKNESS:

7

8          Q     Trooper Burgos, anything else to add?

9     A     No.

10         Q     Have you been treated fairly and with

11    respect here today?

12    A     I will reserve my answer for a later time.

13         Q     At this time I am preparing to end your

14    recorded statement.  I can turn off the recorder and

15    allow you and your attorney to review the statement if

16    you so desire.  Sir, would you like to do that, review

17    your statement?

18         MR. BUKOSKY:  No.  But if there is some

19    mistake, we'll review the transcript and we'll let you

20    know.

21         MR. HARKNESS:  Very good.  Anything else?

22         MR. RIZZO:  No.

23         MR. QUINOA:  No.  Thank you.

24    BY MR. HARKNESS:

25         Q     I will request that you not discuss

1   anything regarding this investigation with anyone so as

2   not to compromise the integrity of the investigation.

3   Sir, do you understand this?

4   A     Yes.

5                MR. HARKNESS:  The tape recorded statement

6   of Trooper I Christopher Burgos is now complete.  The

7   time is 12:07 p.m., February 26th, 2013.  Thank

8   you.

9                (At which time, the proceeding concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     C E R T I F I C A T E

2

3

4

5

6

7        I, GINA BIALAS, Certified Court Reporter and

8 Notary Public of the State of New Jersey, do hereby

9 certify that the foregoing is a true and correct

10 transcript of the proceedings.

11

12

13

14

15

16                  GINA BIALAS
                 CERTIFIED COURT REPORTER
17                  License No.: XIO-1611

18

19

20

21

22

23

24

25

**0**

07601 [1] - 2:5
09354 [1] - 66:2

**1**

10 [2] - 32:3, 35:9
10/18/2012 [1] - 20:9
100 [1] - 81:3
104 [1] - 17:2
10:10 [1] - 1:22
10:33 [1] - 15:22
11 [1] - 21:22
11-43 [2] - 35:20, 79:18
12:07 [1] - 91:7
13 [1] - 23:19
14th [1] - 16:24
16 [2] - 3:5, 27:1
16th [12] - 8:2, 17:10, 22:15, 25:3, 27:5, 27:9, 43:21, 44:18, 46:2, 50:23, 59:6
18th [2] - 4:5, 20:11
19 [1] - 23:19
1963 [2] - 16:24, 28:12
1986 [2] - 17:4, 30:24
1988 [1] - 28:22
1999 [3] - 28:23, 31:5, 31:12
19th [2] - 17:4, 30:24
1st [3] - 17:23, 28:18, 32:6

**2**

2000 [5] - 31:12, 43:19, 43:20, 44:17, 45:7
2001 [1] - 31:14
2009-0354 [4] - 9:4, 22:9, 26:10, 67:5
2010 [1] - 66:24
2011-0361 [2] - 7:5, 19:22
2011-0596 [1] - 7:6
2012 [19] - 8:2, 17:10, 17:23, 20:12, 22:12, 22:16, 25:3, 27:1, 27:9, 28:18, 32:6, 43:21, 43:22, 44:19, 46:2, 59:6, 71:7, 74:25, 84:4
2012-0596 [7] - 7:12, 16:10, 19:1, 19:22, 20:9, 20:23, 22:11

2013 [6] - 1:22, 7:1, 14:6, 15:22, 19:13, 91:7
20th [4] - 84:4, 84:20, 85:21, 86:3
24 [1] - 2:4
25 [3] - 2:15, 32:8, 57:3
26 [1] - 1:21
26th [2] - 15:21, 91:7
27 [3] - 28:20, 30:18
28th [1] - 28:12

**3**

310 [1] - 1:21

**4**

400 [1] - 31:24
4276 [3] - 16:8, 16:22, 19:14
45 [1] - 46:14
49 [1] - 16:24
4th [1] - 22:12

**5**

5150 [1] - 45:3
525 [2] - 6:16, 6:21
5355 [1] - 15:23

**6**

6352 [1] - 48:8

**7**

71 [1] - 3:5
72 [1] - 3:6
75 [1] - 3:7
7th [3] - 6:25, 14:6, 19:13

**8**

810 [1] - 1:20
82 [1] - 3:8
83 [1] - 3:9
84 [1] - 3:11
86 [1] - 3:12

**9**

90 [1] - 3:13

9:56 [6] - 8:3, 25:3, 27:2, 46:2, 61:1, 65:12

**A**

a.m [7] - 1:22, 8:3, 15:22, 25:3, 46:2, 61:1, 65:12
ability [1] - 39:3
able [3] - 26:14, 37:3, 80:8
above-entitled [1] - 1:17
absolutely [3] - 33:19, 53:4, 58:10
abstract [1] - 24:10
Academy [1] - 16:25
academy [1] - 30:23
accidents [1] - 23:9
according [3] - 21:21, 23:19, 23:20
account [1] - 61:18
acknowledged [1] - 85:22
Acknowledgment [4] - 5:10, 7:24, 18:25, 21:7
acquires [1] - 23:24
act [3] - 6:5, 33:10, 39:6
Acting [1] - 34:22
action [4] - 11:25, 27:5, 55:24, 64:14
actions [3] - 12:17, 26:23, 36:14
active [1] - 82:2
activities [2] - 27:10, 37:6
activity [1] - 10:12
actual [2] - 4:3, 49:10
add [5] - 71:15, 79:1, 80:24, 83:7, 90:8
addition [3] - 31:4, 44:6, 80:17
additional [9] - 48:13, 49:13, 52:22, 56:15, 56:17, 57:25, 58:18, 59:19, 65:23
address [3] - 5:22, 43:1, 60:19
adhere [1] - 41:18
adjudicated [3] - 53:17, 75:2, 82:3
Adjudication [1] - 32:16
adjudication [2] - 32:25, 73:20

Administrative [6] - 8:23, 17:6, 17:13, 25:19, 29:7, 48:16
administrative [1] - 15:1
administrator [1] - 68:18
advise [1] - 50:10
advised [5] - 5:25, 70:8, 75:25, 78:1, 84:14
advisor [1] - 33:10
affairs [1] - 79:5
Affairs [3] - 9:14, 15:24, 79:17
affairs' [1] - 36:6
Affairs' [1] - 7:4
affected [3] - 40:14, 42:15, 45:13
affects [1] - 28:16
affiliation [1] - 18:6
age [1] - 16:23
agencies [1] - 81:23
agency [1] - 18:6
ago [3] - 32:3, 53:25, 57:6
agree [6] - 36:19, 37:8, 40:12, 67:11, 67:14, 74:11
agreement [6] - 5:20, 6:10, 27:15, 38:9, 39:20, 39:24
agreements [3] - 38:2, 38:14, 39:4
ahead [1] - 37:14
AIPU [2] - 70:18, 74:3
allegation [8] - 4:4, 7:2, 9:16, 19:15, 20:11, 23:2, 23:14, 23:15
allegations [3] - 23:1, 76:4, 76:23
allow [2] - 25:21, 90:15
allowed [2] - 21:16, 26:8
allowing [1] - 8:14
almost [1] - 28:20
Amendment [6] - 10:17, 10:21, 11:1, 14:16, 14:21, 79:20
amount [3] - 30:21, 54:14, 54:15
answer [15] - 11:12, 21:24, 27:25, 35:24, 47:10, 47:13, 49:25, 54:19, 54:21, 56:2, 72:24, 78:20, 88:9, 89:1, 90:12

answered [1] - 78:19
appear [2] - 11:12, 11:16
applicable [2] - 10:22, 12:22
application [1] - 36:9
applied [4] - 13:9, 21:9, 21:18
apply [2] - 4:10, 23:20
appreciate [1] - 31:11
appropriate [3] - 87:23, 88:10, 88:15
appropriately [1] - 70:6
archived [2] - 61:19, 61:25
Arms [5] - 28:24, 31:6, 31:9, 31:13, 35:6
arrangements [1] - 38:7
article [1] - 89:19
Article [2] - 23:5, 23:19
aspects [1] - 8:10
assert [1] - 14:15
assertion [1] - 36:22
assigned [2] - 15:24, 44:2
assignment [2] - 17:5, 17:9
assistance [3] - 27:14, 43:15, 44:13
Assistant [1] - 16:2
associated [2] - 63:11, 86:18
association [15] - 27:13, 27:20, 29:8, 29:19, 31:21, 32:23, 33:7, 34:5, 34:7, 34:13, 41:10, 42:4, 43:11, 77:17, 85:7
ASSOCIATION [1] - 1:5
Association [6] - 10:16, 17:8, 17:15, 17:18, 28:9, 79:20
attach [2] - 4:7, 4:20
attached [2] - 11:22, 56:6
attachment [3] - 49:1, 51:7, 61:25
attachments [2] - 7:22, 48:3
attempted [1] - 23:9
attend [1] - 11:19
attendance [1] - 17:25

attention [2] - 23:12, 51:5
ATTORNEY [2] - 2:10, 2:12
Attorney [4] - 18:15, 35:18, 36:7, 79:18
attorney [36] - 7:25, 10:16, 21:17, 25:13, 27:19, 36:10, 36:21, 37:4, 39:7, 43:15, 44:1, 44:2, 44:13, 46:20, 48:21, 56:20, 57:15, 60:9, 62:20, 62:25, 65:19, 65:20, 75:24, 79:19, 80:20, 87:10, 87:12, 87:18, 87:20, 88:3, 88:6, 88:21, 88:23, 88:25, 90:15
attorney's [2] - 18:22, 89:16
attorney-client [10] - 10:16, 25:13, 36:10, 36:21, 37:4, 46:20, 60:9, 62:20, 62:25, 79:19
attorneys [12] - 27:15, 31:21, 32:24, 38:3, 38:13, 38:14, 38:18, 39:2, 40:20, 46:16, 76:8, 76:21
August [14] - 8:2, 16:24, 17:9, 22:15, 25:3, 27:1, 27:5, 27:9, 43:21, 44:18, 46:2, 50:24, 59:6
authority [4] - 24:5, 24:15, 33:6, 38:22
authority" [2] - 24:2, 24:12
authorized [8] - 24:1, 24:4, 24:11, 24:15, 43:14, 44:12
available [2] - 23:23, 68:4
average [2] - 41:14, 41:15
aware [15] - 12:21, 30:8, 39:14, 40:8, 40:24, 42:7, 51:19, 56:21, 57:22, 65:24, 67:18, 74:1, 86:7, 86:8

**B**

B-10 [1] - 21:22
backlash [1] - 85:7
Badge [8] - 15:23, 16:8, 16:22, 19:14, 45:3, 48:8
Balls [1] - 89:9
Bargaining [2] - 28:10, 28:13
based [2] - 13:25, 14:6
basis [1] - 29:11
Bear [3] - 1:20, 16:3
bear [1] - 16:5
beat [1] - 88:17
became [4] - 31:1, 31:3, 31:5, 71:6
become [1] - 43:16
beforehand [1] - 25:22
begin [1] - 15:5
BEHALF [2] - 2:6, 2:17
behalf [3] - 4:3, 18:10, 18:15
behind [2] - 36:13, 37:3
believes [1] - 14:14
beneficial [1] - 33:14
best [7] - 33:15, 45:8, 46:5, 51:2, 73:9, 74:8, 82:25
between [2] - 39:6, 59:1
beyond [2] - 6:15, 49:11
BIALAS [4] - 1:18, 3:24, 92:7, 92:16
birth [1] - 16:23
blame [2] - 89:7, 89:8
Blanchard [1] - 34:25
Bloomfield [2] - 31:1, 31:3
board [2] - 38:22, 68:16
Board [1] - 8:23
bound [1] - 42:7
breaches [1] - 23:8
bring [2] - 81:8, 81:19
broad [1] - 37:8
broadcasting [1] - 12:24
brought [1] - 58:23
building [1] - 16:5
BUKOSKY [61] - 2:2, 2:3, 4:18, 4:22, 5:3, 5:8, 6:18, 7:7, 7:14, 8:8, 8:16, 9:24, 11:7, 11:14, 11:17, 12:11, 13:1, 13:5, 13:21, 14:1, 14:11, 15:6, 15:17, 18:9, 18:10, 19:7, 20:4, 20:17, 21:3, 21:11, 21:13, 22:19, 25:11, 26:3, 28:2, 35:17, 36:23, 37:8, 46:18, 47:3, 47:12, 54:13, 54:17, 55:6, 55:11, 60:8, 62:17, 62:24, 63:5, 63:9, 63:12, 63:18, 79:3, 80:9, 81:6, 81:22, 82:6, 82:8, 82:16, 90:4, 90:18
Bukosky [3] - 18:9, 21:8, 78:25
bullied [1] - 89:21
Bureau [1] - 15:25
BURGOS [12] - 1:16, 2:6, 8:18, 9:1, 9:10, 9:22, 16:21, 22:22, 24:22, 37:17, 62:20, 82:20
Burgos [38] - 4:2, 5:11, 5:25, 6:24, 7:1, 7:10, 8:5, 8:7, 8:22, 9:3, 10:3, 12:16, 12:20, 16:8, 16:14, 16:18, 16:21, 18:1, 18:10, 18:20, 18:23, 19:14, 20:12, 20:23, 21:16, 21:21, 24:25, 25:6, 26:8, 26:14, 26:20, 28:6, 75:11, 80:1, 82:19, 87:1, 90:8, 90:16
Burgos [2] - 79:12, 79:25
business [7] - 27:13, 29:8, 29:19, 29:22, 43:9, 43:11, 44:8
BY [4] - 2:3, 2:11, 2:21, 3:5, 3:6, 3:7, 3:8, 3:9, 3:10, 3:11, 3:12, 3:14, 3:24, 16:16, 18:17, 19:8, 20:5, 20:18, 21:4, 21:19, 25:16, 26:5, 28:4, 29:3, 37:24, 46:25, 47:5, 47:19, 54:23, 55:12, 60:11, 63:19, 71:18, 73:4, 75:9, 77:7, 82:22, 83:24, 84:25, 86:25, 90:6, 90:24
bylaws [1] - 30:10

**C**

candor [1] - 22:1
cannot [1] - 35:23

capacity [2] - 33:12, 33:24
CAPACITY [1] - 1:11
care [2] - 6:14, 46:15
CASE [1] - 1:2
case [46] - 5:16, 5:18, 5:19, 6:6, 7:4, 7:5, 7:12, 9:4, 13:9, 14:12, 14:15, 19:20, 19:21, 20:8, 22:25, 26:10, 49:12, 50:7, 51:15, 51:20, 52:15, 52:17, 53:11, 53:17, 54:2, 54:5, 54:6, 54:8, 56:22, 62:13, 64:3, 64:4, 64:6, 66:6, 73:19, 74:19, 75:1, 78:6, 80:6, 84:17, 85:10, 85:14, 89:10
cases [28] - 10:13, 31:22, 44:8, 52:18, 52:20, 53:6, 54:9, 55:22, 71:11, 72:5, 72:19, 72:22, 74:23, 74:24, 75:18, 76:10, 76:17, 77:12, 77:21, 77:22, 78:5, 78:18, 79:24, 80:1, 80:4, 80:7, 82:2, 82:9
caused [2] - 83:11, 85:7
caution [1] - 70:12
cburgos@staf.org [1] - 8:5
cburgos@stfa.org [2] - 43:4, 60:24
Cburgos@stfa.org [1] - 46:10
cburgos@stfa.org] [1] - 25:6
CC [1] - 46:7
centers [1] - 80:25
central [1] - 37:4
Central [1] - 15:25
certain [1] - 10:21
certainly [3] - 13:7, 14:12, 14:22
certification [1] - 59:3
CERTIFIED [2] - 3:24, 92:16
Certified [2] - 1:18, 92:7
certify [1] - 92:9
chain [2] - 23:7, 63:10
chance [3] - 6:17, 25:1, 27:7
change [1] - 11:24
changed [1] - 89:18

characterization [1] - 37:9
charge [1] - 13:20
charged [2] - 55:21, 72:11
Charles [2] - 51:22, 65:5
Charter [1] - 46:17
check [1] - 53:19
CHIEF [1] - 2:22
Chief [8] - 83:8, 83:15, 83:16, 83:25, 84:10, 84:13, 85:3, 86:16
CHIESA [1] - 2:9
Chris [2] - 8:5, 25:5
Christopher [4] - 16:8, 16:21, 19:14, 91:6
CHRISTOPHER [1] - 1:6
civilian [2] - 50:10, 69:22
CJ [1] - 13:18
claiming [2] - 36:9, 88:1
claims [2] - 36:17, 36:18
clarification [4] - 49:3, 64:8, 71:14, 78:13
clarified [2] - 10:7, 79:2
clarify [1] - 85:17
CLASS [1] - 2:24
Class [2] - 15:23, 37:12
class [1] - 16:25
classify [1] - 40:5
clear [6] - 10:4, 55:11, 77:2, 79:3, 79:10, 85:24
clearly [1] - 14:25
client [20] - 10:16, 25:13, 36:10, 36:21, 37:4, 38:8, 41:9, 44:2, 44:3, 44:4, 44:5, 44:6, 44:22, 46:20, 56:6, 60:9, 62:20, 62:25, 79:19
clients [1] - 39:3
clockwise [2] - 17:25, 18:4
cognizance [2] - 23:4, 23:11
collected [1] - 13:11
Collective [2] -
Colonel [4] - 46:14, 84:12, 84:22, 86:6

Colonel's [2] - 32:15, 83:8
command [1] - 23:8
commencing [1] - 1:22
comments [1] - 5:13
commonsensical [1] - 9:8
communicate [2] - 23:7, 54:10
communication [7] - 25:13, 46:21, 46:23, 54:14, 54:20, 62:21, 62:25
communications [3] - 32:14, 58:25, 64:15
COMPELLED [1] - 1:5
competent [4] - 24:1, 24:4, 24:11, 24:15
complaint [3] - 6:1, 12:2, 15:11
complaints [1] - 23:9
complete [3] - 21:25, 22:1, 91:6
completely [2] - 9:6, 9:7
Complex [1] - 2:13
comply [2] - 63:6, 63:13
composure [1] - 27:2
compromise [1] - 91:2
computer [6] - 62:1, 62:7, 62:8, 62:10, 62:11, 63:24
concern [2] - 56:22, 89:19
concerned [1] - 79:7
concerning [4] - 10:12, 13:8, 13:11, 13:20
concerns [2] - 5:21, 86:5
concluded [1] - 91:9
conclusions [2] - 76:4, 76:24
conditions [3] - 28:17, 29:11
conduct [5] - 29:8, 29:18, 29:19, 29:21, 81:11
conducted [1] - 81:5
conducts [1] - 36:2
conduit [2] - 32:22, 39:6
conference [1] - 16:4
confidence [1] - 42:4
confidential [9] -

confidentiality [12] - 6:10, 11:21, 11:22, 12:12, 12:15, 39:20, 39:23, 40:16, 41:3, 41:5, 42:8
confines [1] - 42:14
confirm [2] - 15:7, 36:16
conflicts [1] - 23:16
confused [1] - 12:7
consider [5] - 40:10, 42:8, 45:15, 87:5, 87:7
constitution [1] - 30:10
construed [1] - 24:17
consult [1] - 12:12
contact [2] - 39:2, 70:17
contacting [1] - 61:12
contained [2] - 24:17, 72:22
content [7] - 54:16, 67:12, 85:1, 85:4, 86:9, 86:11, 86:15
contents [3] - 5:14, 25:9, 83:17
context [3] - 5:19, 5:23, 57:23
continue [2] - 28:3, 37:15
continued [1] - 10:20
continues [2] - 6:14, 12:13
continuing [2] - 47:3, 79:15
continuously [1] - 32:5
contract [2] - 29:15, 38:12
contractural [1] - 28:15
contrary [2] - 24:4, 80:24
conversation [15] - 58:14, 58:21, 59:23, 66:5, 66:8, 70:14, 70:15, 70:16, 70:21, 83:14, 83:18, 84:19, 85:2, 85:5, 85:21
conversations [2] - 71:3, 83:20
coordinate [1] - 84:8
copies [2] - 7:14, 63:23

copy [11] - 8:1, 8:22, 9:3, 24:10, 68:4, 68:9, 68:12, 68:14, 68:15, 74:18, 80:19
correct [18] - 13:1, 34:19, 38:12, 40:14, 42:2, 45:21, 48:24, 58:9, 62:6, 62:19, 62:22, 72:6, 72:12, 75:13, 75:19, 78:10, 87:4, 92:9
CORREIA [1] - 2:2
correspondence [3] - 8:1, 25:2, 76:4
Correspondence [1] - 35:4
Counsel [2] - 44:6, 44:21
counsel [21] - 33:7, 34:5, 34:7, 34:14, 38:9, 40:13, 41:10, 42:15, 49:8, 50:1, 51:23, 70:6, 74:13, 77:17, 78:1, 78:10, 78:16, 87:23, 88:10, 88:11, 89:10
count [1] - 14:13
COUNTY [1] - 1:2
couple [1] - 66:23
course [4] - 12:6, 23:25, 34:14, 42:9
COURT [3] - 1:1, 3:24, 92:16
court [2] - 4:21, 22:24
Court [7] - 1:18, 6:11, 11:4, 11:10, 11:19, 12:3, 92:7
cover [2] - 83:10, 89:6
covered [1] - 26:12
covers [1] - 32:6
coverup [2] - 88:3, 88:5
crimes [1] - 23:8
criminal [11] - 10:20, 13:3, 13:8, 13:11, 13:19, 14:9, 14:12, 14:14, 14:19, 14:24, 15:2
Criminal [5] - 6:25, 14:8, 19:12, 19:16, 19:18
crucial [1] - 89:12
current [4] - 52:16, 79:24, 80:1, 80:7
custody [1] - 58:9

**D**

DAG [1] - 57:24
daily [2] - 54:12, 54:25
Dan [4] - 45:3, 73:20, 85:6, 88:9
Daniel [2] - 34:23, 35:9
date [13] - 4:4, 4:24, 15:21, 16:23, 17:3, 20:9, 30:25, 43:22, 44:14, 46:4, 46:5, 50:6, 84:4
dated [3] - 6:25, 19:13, 25:3
day-to-day [1] - 29:8
deal [3] - 14:21, 41:20, 42:14
dealing [4] - 32:17, 32:20, 45:9, 50:1
dealt [1] - 40:9
December [1] - 22:12
decided [1] - 39:12
decision [3] - 42:13, 46:14, 48:17
Declination [5] - 6:24, 7:4, 13:13, 13:15, 19:17
decline [2] - 10:6, 13:22
declined [3] - 11:18, 13:19, 14:8
deem [2] - 41:11, 42:13
defend [1] - 70:6
dEFENDANT [1] - 1:12
DEFENDANTS [1] - 2:17
defense [8] - 27:14, 43:14, 44:12, 45:13, 64:3, 68:10, 68:18, 89:12
definitely [4] - 4:23, 10:7, 13:21
definition [1] - 64:12
degree [1] - 54:17
delay [1] - 84:9
delete [2] - 61:21, 62:12
demanded [2] - 81:16, 82:14
demanding [1] - 80:21
denying [1] - 24:17
depositions [1] - 4:13

Deputy [1] - 18:14
DEPUTY [1] - 2:12
Dermot [2] - 14:7, 19:17
describe [5] - 26:22, 28:6, 35:16, 37:25, 39:9
described [3] - 10:10, 58:3, 77:3
describes [2] - 30:5, 30:11
description [1] - 30:1
desire [2] - 69:25, 90:16
desired [3] - 57:21, 58:2, 58:8
desk [2] - 62:10, 62:11
destination [1] - 4:16
destroy [1] - 46:22
destroyed [3] - 54:1, 81:24, 82:4
detached [2] - 17:6, 29:7
detail [1] - 45:2
Detective [3] - 15:22, 35:2, 48:7
Detective's [1] - 48:18
determination [2] - 39:16, 48:15
dial [1] - 41:14
dialogue [3] - 9:15, 52:22, 58:16
different [6] - 14:5, 36:21, 56:19, 87:18, 88:6, 88:21
DiFrancesco [6] - 57:24, 58:17, 58:24, 59:20, 64:20, 64:25
digital [5] - 5:2, 8:13, 9:12, 18:20, 25:1
dinner [1] - 45:17
direct [3] - 15:7, 15:9, 39:2
directed [1] - 79:13
directions [1] - 41:17
directly [2] - 10:23, 35:21
disc [1] - 68:1
disciplinary [23] - 10:13, 22:2, 31:20, 32:25, 34:2, 34:4, 34:8, 34:9, 38:5, 39:12, 40:6, 42:23, 45:10, 45:12, 48:12, 48:18, 49:9, 52:10, 55:3, 55:15, 55:24, 64:14

**discipline** [4] - 31:19, 39:13, 64:16, 81:3
**disclose** [3] - 9:18, 10:17, 23:21
**disclosed** [2] - 5:15, 40:3
**discloses** [1] - 54:17
**disclosing** [1] - 5:19
**disclosure** [1] - 6:13
**disclosures** [1] - 6:5
**discoveries** [1] - 78:15
**discovery** [86] - 27:17, 32:20, 32:24, 40:6, 40:7, 40:19, 41:8, 42:19, 42:22, 42:24, 49:13, 52:22, 52:23, 52:24, 53:1, 53:10, 53:18, 54:7, 56:14, 56:15, 56:17, 57:23, 57:25, 58:2, 58:17, 58:20, 59:2, 59:19, 59:21, 64:9, 64:10, 64:11, 64:16, 65:23, 70:7, 71:20, 71:21, 71:25, 72:5, 72:10, 73:8, 75:12, 75:14, 75:19, 75:22, 75:23, 75:24, 76:1, 76:5, 76:10, 76:12, 76:18, 76:19, 77:11, 77:12, 77:15, 77:20, 77:23, 77:25, 78:10, 78:11, 78:17, 79:8, 79:9, 79:24, 80:3, 80:5, 80:7, 80:23, 81:2, 81:19, 85:10, 85:24, 86:13, 87:3, 87:4, 87:7, 87:13, 87:16, 88:5, 88:19, 89:12, 89:14, 89:24
**discuss** [7] - 9:21, 37:3, 59:24, 61:11, 61:13, 69:18, 90:25
**discussed** [9] - 4:15, 15:5, 23:18, 29:13, 64:8, 67:23, 69:16, 69:19, 71:11
**discussing** [1] - 36:12
**discussion** [2] - 84:21, 86:19
**discussions** [4] - 33:7, 57:7, 78:9, 84:22
**dismay** [1] - 84:20
**dismissal** [1] - 10:23
**dispute** [1] - 14:19
**disseminate** [2] -

24:8, 41:7
**disseminated** [1] - 41:4
**distribute** [1] - 24:8
**distributing** [1] - 68:21
**DISTRICT** [2] - 1:1, 1:1
**Division** [35] - 2:14, 6:25, 9:18, 9:19, 14:7, 18:15, 19:12, 19:16, 21:23, 23:3, 23:4, 23:6, 23:7, 23:10, 24:1, 24:5, 24:6, 24:10, 24:11, 24:14, 24:15, 24:19, 28:20, 29:10, 30:2, 30:18, 31:3, 39:21, 40:18, 42:10, 42:25, 53:12, 69:20, 69:23
**DIVISION** [1] - 1:2
**divulge** [1] - 42:12
**Docket** [2] - 8:24, 25:20
**document** [67] - 4:3, 4:5, 7:9, 9:5, 19:6, 19:11, 19:24, 20:13, 21:10, 24:10, 25:10, 26:9, 26:12, 26:13, 26:16, 29:14, 30:4, 30:13, 30:14, 40:25, 46:12, 48:13, 48:20, 48:23, 52:5, 52:6, 52:12, 53:20, 53:23, 54:6, 57:19, 59:6, 59:18, 63:22, 64:9, 72:8, 73:8, 73:19, 74:4, 76:9, 76:15, 76:17, 76:19, 76:22, 77:2, 77:3, 77:5, 77:13, 77:15, 77:16, 77:23, 78:17, 79:7, 79:8, 80:6, 80:7, 80:19, 81:1, 82:12, 82:13, 87:17, 88:6, 88:7, 88:19, 88:22
**documents** [45] - 6:8, 6:11, 7:15, 8:14, 9:12, 18:21, 21:15, 22:13, 22:15, 40:8, 41:21, 42:9, 50:4, 50:11, 50:19, 50:23, 56:6, 58:3, 58:6, 58:18, 59:22, 60:17, 63:21, 64:13, 70:1, 70:4, 70:9, 70:13, 76:13, 76:14, 76:16, 77:16, 78:12, 79:10, 79:24, 80:10, 80:12, 81:10, 81:14, 81:24,

86:22, 87:1, 87:2, 87:8, 87:21
**done** [11] - 12:14, 34:15, 39:9, 52:18, 53:11, 53:17, 72:4, 72:17, 72:19, 78:4, 89:18
**door** [1] - 74:10
**down** [1] - 41:14
**dozen** [2] - 43:18, 57:6
**drinks** [1] - 45:17
**drive** [2] - 68:2
**driving** [1] - 88:14
**DSG** [1] - 2:24
**dues** [1] - 30:24
**during** [5] - 22:1, 23:12, 35:13, 35:20, 85:20
**duties** [14] - 17:7, 29:5, 29:13, 29:19, 30:5, 30:12, 31:16, 36:4, 38:6, 40:2, 45:20, 79:12, 79:14, 79:15
**duties"** [1] - 35:22
**duty** [2] - 23:12, 23:25

**E**

**E-mail** [36] - 8:1, 25:2, 26:25, 27:13, 27:16, 42:25, 43:3, 43:11, 43:22, 46:1, 46:3, 46:7, 46:12, 47:2, 47:16, 48:1, 48:3, 49:24, 50:10, 50:14, 50:18, 50:22, 54:11, 60:18, 60:19, 60:20, 60:22, 61:18, 61:19, 61:21, 62:1, 62:16, 63:10, 65:8
**E-Mails** [6] - 8:3, 25:4, 43:8, 43:10, 62:12, 62:14
**effect** [4] - 30:10, 59:4, 70:16, 81:21
**effecting** [1] - 31:19
**eight** [3] - 9:5, 26:8, 48:25
**Eight** [1] - 23:5
**eight-page** [3] - 9:5, 26:8, 48:25
**either** [9] - 10:15, 39:11, 49:16, 49:18, 49:20, 61:12, 61:25, 68:22, 76:7
**elected** [4] - 17:7,

17:21, 32:4, 34:18
**Elected** [4] - 17:17, 28:18, 28:22, 29:2
**electronically** [1] - 22:17
**eligibility** [1] - 39:16
**embarrassing** [1] - 89:11
**emergencies** [1] - 29:20
**employed** [1] - 69:22
**employer** [1] - 11:8
**employment** [2] - 28:17, 29:12
**end** [1] - 90:13
**ENFORCEMENT** [1] - 2:19
**Enforcement** [2] - 1:20, 18:12
**enforcement** [2] - 15:15, 35:25
**enjoin** [1] - 11:18
**enlisted** [4] - 29:25, 50:9, 67:18, 67:20
**ensured** [1] - 12:13
**enter** [1] - 6:9
**entire** [4] - 26:12, 26:21, 32:6, 63:10
**entirely** [1] - 38:21
**entirety** [2] - 10:14, 30:25
**entitled** [3] - 1:17, 14:23, 87:12
**enumerated** [1] - 29:14
**error** [1] - 12:9
**especially** [1] - 56:10
**ESQ** [3] - 2:3, 2:9, 2:11
**Esq** [6] - 22:12, 22:15, 43:13, 44:11, 46:16, 65:5
**ESQS** [1] - 2:2
**essentially** [1] - 26:13
**events** [1] - 10:13
**evidence** [2] - 13:10, 14:5
**Ewing** [2] - 1:21, 16:6
**exact** [3] - 52:21, 53:8, 53:23
**exactly** [6] - 66:25, 80:8, 81:4, 85:4, 89:7, 89:8
**EXAMINATION** [18] - 3:5, 3:5, 3:6, 3:7, 3:8, 3:9, 3:11, 3:12, 3:13, 16:15, 71:17, 73:3, 75:8, 82:21, 83:23,

84:24, 86:24, 90:5
**examples** [1] - 39:10
**except** [1] - 36:9
**exchanged** [1] - 6:12
**excuse** [1] - 16:12
**execute** [1] - 5:11
**executive** [1] - 38:22
**exert** [1] - 14:23
**exerts** [1] - 14:20
**Exhibit** [1] - 5:4
**exhibits** [1] - 4:19
**existence** [2] - 63:23, 63:25
**exists** [2] - 30:13, 82:13
**expect** [2] - 53:2, 66:9, 66:10
**expectation** [1] - 52:25
**expected** [2] - 41:18, 64:10
**expecting** [4] - 49:23, 50:2, 50:4, 50:8
**experience** [2] - 32:8, 40:25
**explain** [8] - 26:22, 32:13, 35:16, 37:25, 43:12, 44:10, 45:2, 89:17
**explained** [1] - 60:16
**explanation** [1] - 36:14
**expressed** [1] - 84:20
**Extension** [3] - 8:23, 25:19, 48:6
**extension** [3] - 8:6, 46:14, 62:3
**extension"** [1] - 25:8
**extent** [1] - 12:4
**eyes** [1] - 89:20

**F**

**fact** [12] - 6:8, 11:24, 36:9, 36:12, 46:21, 52:1, 59:24, 70:4, 70:10, 85:12, 85:15, 88:18
**failure** [2] - 9:17, 23:2
**fairly** [1] - 90:10
**falls** [1] - 23:15
**familiar** [2] - 75:16, 77:20
**far** [8] - 9:11, 10:11, 23:19, 27:11, 29:15, 40:7, 41:22, 51:22

**fashion** [3] - 18:4, 27:13, 70:4
**fault** [3] - 89:15, 89:16
**February** [6] - 1:21, 6:25, 14:6, 15:21, 19:13, 91:7
**federal** [5] - 5:18, 5:19, 5:23, 6:6, 11:25
**fees** [1] - 38:16
**Fifth** [4] - 10:21, 10:25, 14:15, 14:20
**file** [12] - 30:8, 53:9, 53:10, 53:15, 64:1, 64:3, 64:4, 67:22, 68:10, 74:19, 75:5
**filed** [5] - 11:5, 11:25, 12:2, 12:3, 12:9
**files** [2] - 80:14, 81:8
**final** [2] - 48:14, 48:17
**findings** [3] - 86:17, 86:18, 86:19
**fine** [3] - 4:22, 46:24, 63:14
**fires** [1] - 23:9
**firm** [1] - 44:23
**FIRST** [1] - 2:24
**First** [10] - 10:17, 15:23, 29:1, 29:16, 31:15, 32:4, 34:20, 37:12, 68:17, 79:20
**first** [11] - 11:2, 23:2, 43:16, 44:14, 45:6, 45:16, 57:1, 57:3, 65:14, 65:15, 85:19
**Fisher** [16] - 45:3, 45:16, 50:18, 51:7, 56:10, 70:18, 70:22, 70:23, 71:10, 73:21, 73:23, 74:7, 87:8, 87:25, 88:9, 88:19
**Fisher's** [3] - 56:11, 85:6, 87:5
**fit** [1] - 29:22
**five** [2] - 16:12, 34:2
**five-day** [1] - 34:2
**floor** [1] - 26:19
**focus** [2] - 87:25, 88:21
**follow** [4] - 55:2, 64:7, 70:21, 71:14
**follow-up** [4] - 55:2, 64:7, 70:21, 71:14
**foolish** [1] - 12:14
**forced** [1] - 35:23
**foregoing** [1] - 92:9
**Form** [7] - 4:2, 5:10, 6:5, 7:24, 18:25, 20:8,

21:7
**form** [3] - 5:9, 5:12, 5:24
**formal** [1] - 16:4
**format** [1] - 67:24
**forth** [1] - 59:25
**forum** [1] - 12:8
**forward** [11] - 8:6, 25:7, 30:25, 59:16, 60:17, 61:2, 61:6, 65:4, 69:14, 70:9, 70:12
**forwarded** [9] - 27:18, 49:14, 50:10, 56:7, 63:24, 64:1, 66:13, 87:22, 88:2
**forwarding** [4] - 59:7, 70:1, 70:3, 87:5
**four** [2] - 16:13, 23:19
**FRATERNAL** [1] - 1:5
**Fraternal** [4] - 17:8, 17:15, 17:18, 28:9
**Frederick** [1] - 35:1
**Freedom** [2] - 10:16, 79:20
**Freites** [3] - 8:6, 25:7, 48:8
**Freites'** [1] - 56:22
**friend** [1] - 45:15
**FUENTES** [1] - 1:10
**fulfilling** [1] - 17:7
**full** [13] - 16:19, 18:5, 21:25, 32:24, 52:23, 52:24, 52:25, 57:23, 58:17, 58:20, 59:1, 78:10, 78:11
**FW** [1] - 8:5

**G**

**gain** [1] - 23:22
**general** [3] - 4:13, 31:20, 34:4
**General** [2] - 18:15, 36:7
**GENERAL** [2] - 2:10, 2:12
**General's** [2] - 35:18, 79:18
**generally** [1] - 23:23
**generic** [1] - 49:11
**gentleman** [2] - 18:2, 18:3
**GINA** [4] - 1:18, 3:24, 92:7, 92:16
**given** [13] - 71:25, 72:5, 72:11, 75:13,

75:19, 76:10, 80:2, 80:7, 80:12, 87:3, 87:4, 87:7, 88:7
**go-between** [1] - 39:6
**graduate** [1] - 17:1
**graduated** [1] - 30:23
**graduation** [1] - 17:3
**granting** [1] - 46:13
**Grievances** [1] - 28:25, 31:17, 34:24
**grievances** [1] - 31:24
**grounds** [1] - 68:5
**group** [1] - 43:11
**Group** [2] - 28:10, 28:13
**group-wide** [1] - 43:11
**guess** [8] - 5:3, 13:23, 40:11, 41:13, 45:5, 64:11, 71:5, 86:8
**Guidelines** [2] - 35:18, 36:7
**guidelines** [1] - 79:18

**H**

**Hackensack** [1] - 2:5
**half** [1] - 72:22
**hall** [1] - 73:12
**handled** [1] - 34:10
**handling** [3] - 31:18, 41:21, 57:5
**hard** [2] - 49:25, 68:1
**Harkness** [2] - 15:23, 37:12
**HARKNESS** [77] - 2:24, 3:5, 3:7, 3:9, 3:11, 3:14, 4:1, 4:8, 5:1, 5:7, 6:16, 6:20, 6:23, 7:8, 7:16, 7:23, 8:12, 8:17, 8:19, 8:21, 9:2, 9:11, 9:23, 13:14, 13:17, 15:21, 16:16, 17:24, 18:17, 19:5, 19:8, 20:2, 20:5, 20:15, 20:18, 21:1, 21:4, 21:12, 21:14, 21:19, 22:6, 22:23, 24:24, 25:15, 25:16, 26:1, 26:5, 28:3, 28:4, 29:3, 37:15, 37:24, 46:25, 47:5, 47:10, 47:19, 54:23, 55:12, 60:11, 62:19, 62:22,

63:10, 63:19, 71:13, 73:4, 77:6, 78:23, 78:25, 82:18, 82:22, 84:25, 90:1, 90:3, 90:6, 90:21, 90:24, 91:5
**harm** [3] - 69:25, 70:4, 70:10
**Hartman** [19] - 8:2, 22:15, 25:2, 27:1, 44:11, 46:3, 46:16, 46:17, 47:17, 48:20, 49:24, 50:5, 51:11, 52:1, 54:11, 56:3, 56:5, 57:18, 57:20
**Hatrak** [1] - 16:2
**Head** [1] - 16:2
**head** [1] - 52:17
**Headquarters** [1] - 29:10
**headquarters** [1] - 16:6
**hear** [1] - 14:3
**hearing** [3] - 11:10, 34:4, 34:10
**hearings** [8] - 12:3, 31:20, 31:21, 33:21, 34:2, 34:11, 42:23, 52:11
**heels** [1] - 89:15
**held** [6] - 12:7, 13:10, 28:21, 32:1, 32:5, 39:24
**hereby** [1] - 92:8
**herein** [1] - 24:17
**hides** [1] - 36:13
**hire** [3] - 38:11, 38:12, 38:20
**HIS** [1] - 1:10
**history** [2] - 31:10, 74:5
**hold** [1] - 74:22
**holding** [1] - 28:23
**hope** [1] - 11:2
**Hughes** [1] - 2:13
**Human** [1] - 17:11
**hundreds** [8] - 34:1, 34:15, 52:18, 52:20, 53:6, 72:20, 80:13
**hunt** [3] - 83:9, 84:18, 85:15
**hurts** [1] - 88:15

**I**

**idea** [3] - 53:24, 54:3, 74:6
**identification** [1] - 4:14

**identified** [8] - 7:5, 8:4, 22:12, 26:25, 46:6, 48:7, 58:19, 85:11
**identifies** [5] - 7:1, 19:13, 19:20, 20:10, 22:11
**identify** [22] - 17:16, 18:4, 23:1, 26:15, 29:6, 30:21, 34:16, 42:20, 42:25, 43:8, 45:5, 45:16, 51:16, 52:15, 54:5, 58:1, 66:19, 74:3, 75:1, 83:25, 85:9
**II** [3] - 34:25, 35:4, 48:7
**imagine** [1] - 6:1
**immediately** [2] - 16:11, 56:9
**impending** [1] - 32:19
**important** [3] - 9:19, 84:13, 84:14
**improper** [1] - 80:15
**IN** [1] - 1:10
**in-service** [2] - 29:23, 29:24
**inappropriate** [1] - 79:21
**INC** [2] - 1:6, 3:23
**Incident** [2] - 4:2, 20:8
**include** [4] - 22:3, 35:10, 58:4, 78:2
**included** [11] - 42:24, 73:8, 76:1, 76:12, 76:18, 76:19, 77:14, 77:25, 78:8, 78:15, 80:23
**including** [1] - 57:22
**incorporated** [1] - 28:11
**incorporation** [1] - 30:11
**incorrect** [3] - 7:4, 19:20, 19:21
**indicate** [5] - 4:24, 9:25, 21:15, 22:23, 35:23
**indicated** [8] - 13:3, 13:7, 51:25, 56:4, 56:5, 60:13, 63:1, 79:7
**indicates** [3] - 5:14, 5:24, 35:19
**indicating** [1] - 81:6
**individual** [1] - 55:25
**individually** [1] - 55:19

**information** [19] -
9:17, 9:18, 10:18,
21:25, 22:7, 23:3,
23:10, 23:13, 23:18,
23:23, 24:5, 24:13,
24:18, 26:24, 27:18,
40:3, 40:10, 40:17,
53:24
  **infringe** [1] - 12:18
  **initial** [1] - 6:15
  **initialing** [1] - 7:13
  **initials** [2] - 4:11,
21:17
  **initiated** [1] - 11:11
  **inquired** [1] - 84:6
  **instructions** [2] -
41:2, 41:6
  **integrity** [1] - 91:2
  **intended** [1] - 5:17
  **interact** [1] - 43:17
  **interacted** [1] - 44:15
  **interactions** [1] -
45:8
  **interest** [3] - 23:16,
33:18, 48:7
  **internal** [21] - 11:6,
12:21, 16:9, 24:7,
30:15, 32:19, 35:21,
36:2, 36:6, 36:19,
36:25, 37:1, 37:6,
38:21, 42:10, 63:16,
72:3, 72:8, 79:5,
80:18, 82:13
  **Internal** [13] - 7:4,
9:4, 9:14, 15:24, 22:9,
22:10, 26:9, 52:13,
57:2, 75:17, 77:9,
79:17, 80:22
  **intertwine** [1] - 12:5
  **Interview** [9] - 8:10,
9:14, 10:3, 11:18,
13:24, 16:7, 22:18,
25:5, 41:23
  **INTERVIEW** [1] - 1:5
  **interviews** [2] -
32:19, 41:22
  **introduce** [1] - 48:2
  **introduced** [1] -
23:18, 48:4
  **investigating** [1] -
21:25
  **Investigation** [41] -
5:15, 10:10, 10:15,
11:6, 11:22, 11:23,
13:4, 13:8, 13:11,
13:20, 14:6, 14:9,
14:20, 15:12, 16:9,
19:1, 20:23, 22:6,
22:10, 30:15, 35:21,
36:4, 36:15, 36:20,

36:24, 57:22, 62:15,
63:17, 75:4, 79:6,
79:9, 79:16, 79:22,
80:25, 81:4, 81:11,
83:3, 84:15, 88:22,
91:1, 91:2
  **Investigation** [9] -
9:4, 15:25, 22:9,
22:11, 26:10, 52:13,
57:2, 75:17, 77:10
  **investigation"** [1] -
36:1
  **investigations** [3] -
24:7, 49:21, 84:10
  **INVESTIGATOR** [1] -
2:22
  **involve** [3] - 34:2,
48:9, 49:3
  **involved** [12] - 30:22,
32:11, 33:2, 34:8,
38:24, 39:1, 49:17,
53:7, 57:4, 67:7,
68:21, 74:2
  **involvement** [2] -
49:11, 68:19
  **involves** [1] - 49:7
  **involving** [3] - 29:11,
33:1, 38:5
  **issue** [2] - 64:8, 81:7
  **issues** [2] - 28:16,
88:14
  **itself** [3] - 29:9, 36:3,
55:18

**J**

  **January** [4] - 17:23,
28:18, 32:6, 71:7
  **JEFFREY** [1] - 2:9
  **JERSEY** [4] - 1:1,
1:5, 1:9, 1:10
  **Jersey** [22] - 1:19,
1:21, 2:5, 2:16, 5:9,
7:10, 8:22, 9:3, 16:1,
16:6, 16:25, 17:18,
18:24, 19:11, 20:8,
20:21, 25:19, 26:9,
52:12, 57:2, 77:9,
92:8
  **Jersey's** [1] - 83:12
  **job** [1] - 30:2
  **jobs** [2] - 29:17
  **JOHN** [1] - 3:23
  **JOSEPH** [1] - 1:10
  **Jr** [1] - 18:14
  **JR** [1] - 2:11
  **Juckett** [8] - 49:7,
51:17, 51:18, 84:17,
85:10, 85:14, 86:14,

89:10
  **Judge** [6] - 7:21,
11:11, 11:15, 11:18,
81:8, 81:19
  **June** [2] - 17:4,
30:23
  **Justice** [6] - 2:13,
6:25, 14:8, 19:13,
19:16, 19:18

**K**

  **Katherine** [16] - 8:2,
22:15, 25:2, 26:25,
44:11, 46:3, 46:16,
47:17, 48:20, 49:24,
50:5, 51:11, 52:1,
54:11, 56:3, 56:5
  **Katy"** [1] - 46:15
  **keep** [3] - 56:4,
69:12, 74:9
  **Kenneth** [1] - 35:2
  **kept** [2] - 42:4, 53:9,
53:10
  **kind** [3] - 13:19,
14:9, 28:1
  **knowledge** [3] -
26:21, 64:19, 82:25
  **known** [1] - 73:21
  **Kuhn** [1] - 35:5

**L**

  **labor** [1] - 28:16
  **Labor** [4] - 29:10,
53:14, 53:19, 74:20
  **laid** [1] - 6:10
  **language** [1] - 29:15
  **laptop** [1] - 62:9
  **last** [7] - 16:19, 18:5,
37:22, 54:5, 73:6,
73:17, 74:24
  **latest** [1] - 53:24
  **LAW** [2] - 1:2, 2:19
  **law** [3] - 15:15,
24:19, 35:25
  **Law** [9] - 1:20, 2:14,
8:23, 18:12, 18:15,
19:12, 25:19, 48:16,
83:12
  **laws** [1] - 12:22
  **lead** [2] - 22:2, 34:6
  **leads** [1] - 38:23
  **leaks** [1] - 84:16
  **least** [8] - 4:10,
12:24, 26:14, 43:18,
43:19, 44:16, 74:11,
74:19
  **leave** [2] - 11:2,

77:17
  **led** [1] - 22:14
  **Ledger** [3] - 83:10,
88:11, 89:19
  **left** [4] - 13:22, 18:1,
18:2, 74:18
  **legal** [16] - 12:9,
27:14, 35:12, 35:13,
38:3, 38:12, 38:16,
39:17, 39:18, 42:16,
43:14, 44:12, 68:10,
68:18, 78:16
  **Legg** [1] - 35:7
  **Legislation** [3] -
28:25, 31:17, 34:24
  **less** [2] - 22:1, 45:10
  **Letter** [5] - 6:24, 7:3,
13:13, 13:14, 19:17
  **letter** [10] - 7:18,
13:6, 14:2, 14:7, 15:1,
19:20, 64:24, 65:1,
80:20
  **level** [1] - 36:21
  **LICENSE** [1] - 3:25
  **License** [1] - 92:17
  **licensed** [1] - 38:2
  **Lieutenant** [17] -
45:3, 45:16, 50:18,
51:7, 56:9, 56:11,
70:17, 70:22, 70:23,
71:10, 73:23, 74:7,
85:6, 87:5, 87:7,
87:25, 88:19
  **LIMSKY** [1] - 2:2
  **line** [2] - 42:21, 55:3
  **lines** [1] - 40:25
  **List** [2] - 7:12, 20:22
  **list** [3] - 38:12, 38:18,
38:19
  **litigant** [1] - 89:9
  **Littles** [2] - 84:2,
84:13
  **located** [1] - 16:5
  **location** [1] - 16:2
  **LOCCKE** [1] - 2:2
  **lock** [1] - 72:24
  **longest** [1] - 73:21
  **look** [3] - 19:23,
20:12, 26:2
  **looked** [1] - 77:11
  **looking** [6] - 5:8,
27:3, 33:17, 80:18,
83:12, 84:18
  **looks** [1] - 4:9
  **Louie** [1] - 48:7
  **Louis** [1] - 46:13
  **LPP4276hewnjsp.
org** [1] - 43:2
  **Lutz** [1] - 35:3

**M**

  **mail** [1] - 60:22
  **Mail** [35] - 8:1, 25:2,
26:25, 27:13, 27:16,
42:25, 43:3, 43:11,
43:22, 46:1, 46:3,
46:7, 46:12, 47:2,
47:16, 48:1, 48:3,
49:24, 50:10, 50:14,
50:18, 50:22, 54:11,
60:18, 60:19, 60:20,
61:18, 61:19, 61:21,
62:1, 62:16, 63:10,
65:8
  **Mails** [6] - 8:3, 25:4,
43:8, 43:10, 62:12,
62:14
  **maintain** [2] - 29:22,
81:10
  **maintaining** [1] -
40:16
  **major** [2] - 84:3, 88:3
  **management** [1] -
28:15
  **manner** [2] - 69:15,
70:1
  **MANUEL** [1] - 2:21
  **Manuel** [1] - 18:11
  **mark** [3] - 4:6, 4:18,
5:3
  **marked** [2] - 4:14,
9:7
  **Market** [1] - 2:15
  **material** [2] - 81:17,
82:15
  **Material** [2] - 7:11,
20:22
  **matter** [45] - 1:17,
9:15, 10:11, 10:20,
12:6, 13:9, 19:15,
19:22, 26:22, 27:6,
27:17, 33:14, 33:16,
36:15, 38:5, 39:12,
41:8, 41:16, 42:6,
42:9, 45:12, 48:8,
48:12, 48:18, 49:3,
49:9, 49:16, 49:18,
51:18, 55:9, 56:18,
58:4, 59:2, 59:17,
62:16, 63:11, 64:13,
66:1, 66:17, 67:5,
67:24, 83:20, 88:7
  **matters** [21] - 14:24,
23:13, 24:5, 29:11,
32:11, 32:18, 32:25,
33:3, 33:8, 33:11,
34:5, 34:6, 34:8,
34:10, 40:6, 41:12,

45:10, 55:4, 55:15, 57:6, 66:20
**mean** [4] - 33:3, 35:18, 64:11, 64:12
**meaning** [1] - 86:16
**means** [1] - 13:16
**measure** [2] - 14:13, 72:15
**media** [2] - 24:16, 88:14
**member** [51] - 15:11, 22:16, 23:6, 23:13, 23:20, 23:24, 24:9, 30:24, 30:25, 33:15, 33:17, 34:12, 36:22, 39:4, 39:11, 39:15, 39:17, 40:14, 41:9, 45:21, 50:22, 51:14, 51:17, 55:22, 56:13, 57:11, 57:13, 64:14, 65:20, 67:19, 70:6, 70:8, 70:12, 70:18, 70:19, 73:6, 73:7, 73:9, 73:13, 73:18, 74:2, 74:3, 74:15, 74:22, 75:3, 75:13, 75:19, 75:25, 76:11
**member's** [6] - 23:11, 23:12, 28:16, 45:11, 64:15, 89:12
**members** [37] - 10:13, 21:23, 23:23, 27:16, 27:19, 28:14, 31:19, 32:12, 32:17, 32:21, 32:23, 33:1, 33:8, 34:1, 34:11, 35:12, 38:4, 38:17, 39:13, 39:14, 40:19, 42:15, 44:20, 49:8, 51:19, 52:10, 67:11, 67:15, 68:16, 71:20, 72:11, 84:6, 84:7, 84:8, 85:8, 89:21, 89:23
**memorandums** [1] - 42:18
**memos** [2] - 42:16, 42:24
**mentioned** [2] - 17:14, 30:17
**MERCER** [1] - 1:2
**message** [2] - 56:3, 56:5
**met** [3] - 44:14, 45:6, 45:20
**MICHAEL** [1] - 2:3
**Michael** [1] - 18:9
**mid** [1] - 31:12
**might** [2] - 80:19, 80:24

**Mike** [4] - 4:6, 4:17, 34:20, 68:17
**mind** [1] - 7:13
**minds** [1] - 89:18
**mine** [2] - 21:9, 56:17
**minor** [3] - 34:1, 34:8, 34:9
**misconduct** [1] - 23:10
**mistake** [6] - 51:8, 51:11, 51:13, 52:2, 56:11, 90:19
**moment** [1] - 27:2
**momentarily** [1] - 16:14
**Monodragon** [1] - 35:7
**month** [1] - 74:24
**morning** [1] - 65:12
**most** [2] - 26:13, 54:5
**move** [3] - 17:12, 33:8
**moved** [1] - 31:14
**MR** [207] - 3:5, 3:6, 3:7, 3:8, 3:9, 3:10, 3:11, 3:12, 3:14, 4:1, 4:6, 4:8, 4:12, 4:18, 4:20, 4:22, 5:1, 5:3, 5:7, 5:8, 6:3, 6:16, 6:18, 6:20, 6:22, 6:23, 7:7, 7:8, 7:14, 7:16, 7:18, 7:23, 8:8, 8:12, 8:16, 8:17, 8:18, 8:19, 8:20, 8:21, 9:1, 9:2, 9:10, 9:11, 9:22, 9:23, 9:24, 11:2, 11:7, 11:9, 11:14, 11:15, 11:17, 11:20, 12:11, 12:19, 13:1, 13:2, 13:5, 13:12, 13:14, 13:16, 13:17, 13:18, 13:21, 13:25, 14:1, 14:4, 14:11, 14:18, 15:6, 15:9, 15:17, 15:20, 15:21, 16:16, 17:24, 18:9, 18:11, 18:14, 18:17, 19:5, 19:7, 19:8, 20:2, 20:4, 20:5, 20:15, 20:17, 20:18, 21:1, 21:3, 21:4, 21:11, 21:12, 21:13, 21:14, 21:19, 22:6, 22:19, 22:20, 22:21, 22:22, 22:23, 24:22, 24:23, 24:24, 25:11, 25:15, 25:16, 26:1, 26:3, 26:5, 28:2, 28:3, 28:4, 29:3, 35:17,

36:8, 36:23, 37:1, 37:8, 37:10, 37:15, 37:16, 37:17, 37:19, 37:24, 46:18, 46:24, 46:25, 47:3, 47:5, 47:8, 47:10, 47:12, 47:14, 47:19, 54:13, 54:15, 54:17, 54:21, 54:23, 55:6, 55:9, 55:11, 55:12, 60:8, 60:10, 60:11, 62:17, 62:19, 62:20, 62:22, 62:24, 63:3, 63:5, 63:7, 63:9, 63:10, 63:12, 63:14, 63:18, 63:19, 71:13, 71:16, 71:18, 73:4, 75:9, 77:6, 77:7, 78:22, 78:23, 78:24, 78:25, 79:3, 79:23, 80:9, 80:16, 81:6, 81:13, 81:22, 82:1, 82:6, 82:7, 82:8, 82:11, 82:16, 82:17, 82:18, 82:20, 82:22, 83:24, 84:25, 86:25, 89:25, 90:1, 90:2, 90:3, 90:4, 90:6, 90:18, 90:21, 90:22, 90:23, 90:24, 91:5
**must** [2] - 11:19, 35:21
**mutually** [1] - 33:14

### N

**name** [7] - 15:22, 16:19, 16:20, 18:5, 18:6, 34:16, 52:17
**named** [5] - 15:11, 55:4, 55:16, 55:18, 55:23
**narrowly** [2] - 35:21, 79:13
**nature** [6] - 6:1, 10:10, 14:15, 39:13, 42:10, 76:24
**necessarily** [1] - 12:4
**necessary** [1] - 41:11
**need** [6] - 12:17, 34:13, 64:11, 78:13, 81:7, 84:7
**needed** [2] - 6:8, 42:5
**needs** [1] - 10:6
**negotiated** [1] - 45:14
**negotiation** [1] -

32:25
**negotiations** [1] - 28:15
**never** [4] - 81:1, 81:14, 81:18, 87:21
**NEW** [4] - 1:1, 1:5, 1:9, 1:9
**new** [1] - 14:5
**New** [23] - 1:19, 1:21, 2:5, 2:16, 5:9, 7:10, 8:22, 9:3, 16:1, 16:6, 16:25, 17:18, 18:24, 19:11, 20:7, 20:20, 25:18, 26:9, 52:12, 57:1, 77:9, 83:11, 92:8
**news** [2] - 24:16, 83:10
**next** [2] - 18:3, 38:23
**nine** [1] - 29:1
**NJSP** [3] - 69:25, 70:4, 70:10
**NO** [2] - 1:2, 3:25
**noncommissioned** [1] - 51:23
**normal** [2] - 6:9, 11:22
**Notary** [1] - 1:19, 92:8
**note** [4] - 5:24, 8:8, 10:9, 10:19
**noted** [3] - 31:7, 37:13, 41:23
**notes** [3] - 1:16, 42:3, 76:24
**nothing** [12] - 9:22, 12:14, 24:16, 30:7, 36:3, 40:7, 79:5, 79:11, 79:22, 89:17, 90:2, 90:4
**notice** [1] - 77:24
**noticed** [1] - 77:11
**Notification** [2] - 7:11, 20:22
**notify** [2] - 23:2, 56:9
**November** [5] - 84:4, 84:20, 85:21, 86:2, 86:3
**Number** [2] - 8:24, 25:20
**number** [19] - 7:5, 16:22, 19:1, 19:21, 20:9, 20:23, 22:9, 23:14, 23:15, 26:10, 31:22, 52:21, 53:8, 72:25, 73:1, 77:22, 80:3
**numbers** [1] - 30:19
**numerous** [3] - 57:24, 84:5, 87:2

**Nuzzi** [26] - 22:11, 22:14, 27:18, 43:13, 44:6, 44:21, 49:14, 51:17, 57:18, 57:20, 58:16, 58:24, 59:3, 59:7, 59:17, 59:20, 59:23, 60:13, 61:7, 61:12, 63:1, 64:18, 64:24, 65:14, 65:16, 65:19

### O

**O'Brien** [1] - 34:23
**O'Grady** [2] - 14:7, 19:17
**OAL** [3] - 8:23, 25:20, 56:22
**oath** [1] - 15:13
**object** [8] - 25:11, 35:17, 36:5, 46:19, 54:18, 55:6, 63:12, 80:15
**objection** [7] - 37:10, 37:13, 47:4, 54:13, 60:8, 63:14, 79:15
**obligated** [2] - 21:24, 47:10
**obligation** [1] - 56:17
**obligations** [2] - 15:14, 15:15, 27:12
**obtain** [2] - 24:18, 33:13
**obvious** [1] - 83:9
**obviously** [6] - 5:22, 11:25, 37:13, 42:11, 83:11, 84:17
**occur** [1] - 70:14
**occurred** [1] - 27:11
**occurrence** [1] - 54:12
**occurring** [1] - 14:22
**occurs** [1] - 38:1
**October** [4] - 4:5, 20:11, 28:11
**OF** [8] - 1:1, 1:5, 1:9, 1:9, 1:5, 2:6, 2:17, 2:19
**offer** [3] - 9:13, 9:15, 60:15
**offering** [1] - 9:19
**OFFICE** [1] - 2:19
**Office** [19] - 1:19, 5:9, 7:10, 8:22, 18:12, 18:24, 20:21, 25:19, 29:10, 32:15, 45:9, 48:15, 53:19, 83:9, 83:15, 88:4, 89:5
**office** [19] - 15:13,

42:4, 53:14, 53:25, 56:16, 59:14, 62:8, 64:3, 68:10, 69:5, 69:10, 71:2, 73:11, 73:25, 79:25, 80:2, 80:4, 80:11, 82:4
**Officer** [8] - 5:11, 5:25, 10:2, 12:16, 15:14, 18:10, 28:22, 79:12
officer [3] - 15:15, 30:12, 41:10
officer's [1] - 51:23
officers [7] - 22:1, 34:18, 35:9, 35:20, 35:25, 41:4, 41:7
Officers [1] - 35:23
official [2] - 5:6, 23:25
OFFICIAL [1] - 1:11
officially [2] - 9:20, 67:7
often [4] - 54:10, 54:11, 54:22, 54:25
old [2] - 16:24, 74:24
Olivera [1] - 35:9
ON [2] - 2:6, 2:17
once [4] - 5:6, 53:11, 53:16, 54:1
one [27] - 5:13, 5:14, 8:3, 8:4, 23:14, 25:4, 34:11, 44:20, 46:2, 46:12, 49:7, 50:3, 53:21, 53:22, 54:4, 55:25, 56:5, 57:22, 60:21, 60:23, 61:9, 68:14, 68:15, 76:8, 78:20
ones [3] - 43:9, 73:15, 82:11
ongoing [4] - 52:22, 58:16, 58:25, 79:25
open [4] - 13:8, 13:10, 13:11, 13:23
operations [4] - 24:6, 36:2, 36:25, 37:2
opinion [2] - 14:13, 70:5
opportunity [3] - 9:13, 9:15, 9:20
OPS [38] - 4:4, 11:23, 12:21, 15:11, 16:3, 16:6, 20:11, 22:8, 22:16, 32:11, 35:13, 39:24, 40:3, 40:10, 40:16, 41:2, 41:5, 41:16, 42:8, 42:17, 45:21, 50:22, 56:8, 56:9, 57:11, 63:16,

70:18, 70:19, 73:6, 73:9, 73:19, 75:3, 75:25, 76:7, 76:20, 78:1, 78:16, 80:2
order [18] - 11:4, 11:5, 11:7, 11:9, 11:14, 11:15, 11:19, 36:15, 46:13, 54:19, 63:6, 63:13, 65:18, 81:7, 81:17, 81:20, 82:15, 82:16
Order [5] - 11:4, 11:11, 12:1, 25:19, 48:6
ordered [13] - 10:5, 10:8, 10:23, 11:3, 14:17, 15:12, 15:18, 54:21, 63:5, 63:7, 63:13, 63:16, 80:16
ordering [2] - 47:12, 54:18
orders [3] - 10:3, 15:7, 15:10
ordinarily [1] - 6:12
original [1] - 24:10
outcome [1] - 33:13
own [4] - 36:6, 78:16, 81:11, 81:23

**P**

p.m [1] - 91:7
package [17] - 45:11, 53:21, 54:7, 71:21, 73:8, 74:12, 76:20, 77:11, 77:12, 77:15, 77:23, 77:25, 80:5, 80:23, 81:2, 81:19, 88:1
packages [9] - 42:19, 42:24, 71:22, 72:10, 77:20, 77:21, 87:16, 88:2
page [3] - 9:5, 26:8, 48:25
PAGE [1] - 3:4
pain [1] - 10:23
papers [1] - 30:11
parenthesis [1] - 25:6
Parkway [1] - 31:4
part [19] - 5:18, 6:6, 7:20, 13:6, 30:11, 40:2, 42:18, 42:22, 52:25, 54:7, 58:5, 63:16, 64:10, 64:16, 75:18, 76:1, 77:22, 80:3, 85:19
participate [3] - 11:6,

15:13, 15:16
particular [74] - 4:5, 7:3, 10:22, 13:20, 16:2, 17:22, 19:6, 19:15, 19:24, 20:10, 21:22, 25:5, 25:10, 26:23, 26:25, 29:14, 30:15, 43:22, 46:1, 46:4, 46:6, 47:1, 48:3, 48:6, 48:8, 48:23, 49:3, 49:12, 49:16, 49:20, 49:24, 50:3, 50:4, 50:6, 50:11, 50:14, 50:18, 50:22, 51:20, 52:6, 52:12, 52:19, 53:20, 54:6, 57:8, 58:2, 58:8, 59:5, 59:17, 61:18, 62:16, 63:11, 63:22, 64:9, 65:18, 66:1, 67:5, 72:8, 73:7, 73:18, 74:4, 75:4, 76:9, 76:21, 77:2, 77:13, 77:23, 77:25, 78:17, 80:6, 80:21, 83:20, 88:22
parties [1] - 33:13
party [4] - 55:4, 55:16, 55:18, 55:23
past [7] - 29:1, 39:10, 39:25, 44:7, 52:7, 74:5, 75:20
Patricia [1] - 84:2
pay [1] - 38:16
paying [1] - 30:24
peace [1] - 23:8
pecuniary [1] - 23:22
pending [10] - 14:20, 31:24, 32:11, 32:17, 33:14, 39:11, 41:8, 45:10, 48:12, 49:8
people [6] - 16:12, 16:13, 38:19, 70:22, 73:11, 74:9
per [2] - 7:16, 15:10
percent [1] - 81:3
percentage [3] - 72:18, 72:20, 73:1
perfectly [1] - 10:4
performance [6] - 23:12, 35:22, 35:25, 36:3, 79:11, 79:13
perhaps [1] - 78:16
period [3] - 31:15, 32:2, 74:25
permission [1] - 29:18
person [13] - 22:13, 23:22, 24:9, 24:16, 34:4, 41:11, 50:9,

58:19, 58:21, 69:15, 73:21, 86:18
personal [5] - 44:1, 44:8, 45:15, 66:17, 68:5
personally [5] - 33:2, 33:20, 43:23, 44:24, 66:13
perspective [1] - 12:25
pertain [2] - 24:6, 79:5
pertaining [4] - 22:9, 32:12, 58:3, 64:13
pertains [1] - 24:14
pertinence [1] - 26:24
ph [1] - 89:9
phase [1] - 34:11
phone [2] - 50:17, 50:21
photocopy [1] - 25:20
picks [1] - 74:15
place [3] - 22:25, 34:13, 39:15
PLAINTIFF [1] - 1:7
plan [7] - 27:15, 39:15, 39:18, 43:15, 44:13, 68:18
play [1] - 39:8
plus [2] - 29:1, 43:18
point [8] - 8:9, 31:5, 45:4, 58:15, 60:1, 81:14, 88:8, 89:13
Police [27] - 5:9, 7:10, 9:3, 11:6, 11:7, 12:7, 12:16, 15:10, 15:14, 16:25, 17:20, 18:16, 18:24, 20:8, 20:21, 21:24, 26:9, 37:7, 44:8, 52:13, 57:2, 67:18, 68:4, 77:9, 77:14, 83:21, 88:4
POLICE [1] - 1:10
policies [2] - 36:6, 79:17
policy [1] - 40:15
POLO1779-12S [2] - 8:24, 25:20
portion [1] - 5:14
position [1] - 17:14, 17:22, 31:14, 31:18, 32:1, 32:4, 32:5, 36:10, 52:5, 89:16
positions [3] - 28:21, 28:24, 31:7
possession [6] - 53:21, 74:20, 85:12,

85:19, 85:20, 86:1
possible [3] - 33:16, 72:2, 84:8
possibly [3] - 55:1, 62:7, 68:17
preamble [1] - 15:5
prefer [1] - 4:8
preparation [2] - 32:24, 42:23
prepare [1] - 45:13
preparing [1] - 90:13
present [8] - 8:6, 13:22, 17:5, 18:24, 28:12, 28:19, 28:23, 31:7
presented [1] - 18:20
presenting [5] - 6:23, 7:9, 7:23, 8:1, 9:2
presents [1] - 29:9
preserve [1] - 47:9
preserved [1] - 63:15
President [38] - 17:7, 17:17, 28:7, 28:8, 28:18, 28:24, 28:25, 29:1, 29:2, 29:16, 31:15, 31:17, 32:2, 32:4, 32:11, 33:3, 33:23, 33:24, 33:25, 34:20, 34:22, 34:24, 36:11, 36:13, 40:2, 41:3, 44:5, 44:22, 48:9, 49:4, 55:5, 55:16, 55:20, 68:17, 68:25, 71:6, 89:20
President@stfa.org [2] - 43:5, 43:7
press [3] - 67:12, 67:15, 67:19
pretty [2] - 38:18, 40:11
prevent [1] - 6:5
primary [1] - 29:5
Principal [2] - 5:10, 18:25
principal [6] - 7:1, 15:12, 16:9, 19:14, 49:18, 67:4
principals [2] - 20:22, 32:20
Principals [1] - 7:12
print [2] - 67:22, 68:8
priority [2] - 29:17, 84:9
privilege [11] - 10:16, 14:23, 25:14, 36:10, 36:21, 37:4, 37:5, 46:21, 46:22, 60:9, 79:19
privileged [5] -

10:15, 54:14, 54:20,
62:25, 63:2
  problem [3] - 6:3,
6:7, 12:19
    problems [1] - 83:11
  procedures [2] -
36:6, 79:17
    procedures" [1] -
24:7
  proceed [2] - 13:19,
14:8
  proceeding [9] -
5:23, 6:14, 10:22,
12:9, 12:15, 14:25,
15:2, 91:9
    proceedings [4] -
1:17, 12:21, 35:13,
92:10
  process [5] - 12:13,
33:9, 34:12, 38:21,
38:24
  processes [1] -
42:11
  produce [3] - 63:16,
81:17, 82:15
  produced [3] -
19:10, 19:17, 81:18
  PROFESSIONAL [1]
- 2:19
  professional [1] -
66:17
  Professional [10] -
1:20, 5:10, 7:11,
18:12, 18:25, 20:21,
32:15, 45:9, 88:4,
89:5
  professionally [1] -
44:25
  promptly [1] - 23:7
  proper [6] - 32:21,
56:13, 70:6, 87:20,
89:14, 89:23
  properly [3] - 29:20,
39:4, 89:20
  protected [3] -
10:25, 25:13, 46:23
  protecting [1] -
36:11
  proven [1] - 23:4
  provide [15] - 10:24,
14:17, 15:7, 15:18,
21:24, 26:20, 35:12,
38:3, 52:23, 62:23,
63:3, 63:6, 63:8,
78:17, 80:1
  provided [16] -
19:11, 20:7, 20:20,
21:6, 21:8, 22:13,
24:25, 25:18, 38:7,
39:17, 72:1, 73:7,

80:19, 81:1, 81:15,
89:14
  providing [1] - 8:21
  provision [1] - 29:21
  public [9] - 6:13,
12:1, 12:4, 12:5, 12:8,
23:24, 24:18, 42:12,
42:14
  Public [4] - 1:19,
19:12, 83:12, 92:8
  purposes [1] - 4:15
  pursuant [5] - 11:4,
15:13, 15:14, 24:19
  put [15] - 7:3, 15:4,
16:11, 16:14, 19:19,
22:25, 24:25, 37:10,
45:11, 48:1, 49:1,
49:17, 89:7, 89:8,
89:10
  puts [1] - 89:14
  putting [2] - 31:9,
47:9

## Q

  qualifications [1] -
29:23
  quantitative [1] -
72:15
  questioning [2] -
11:16, 55:3
  questions [31] - 7:6,
8:17, 8:25, 9:9, 11:13,
19:3, 19:6, 19:25,
20:1, 20:3, 20:13,
20:14, 20:16, 20:24,
21:2, 21:12, 21:24,
24:20, 24:23, 25:24,
26:19, 35:19, 35:20,
35:24, 35:25, 36:5,
36:24, 37:13, 79:1,
79:4, 79:13
  QUINOA [19] - 2:21,
3:6, 3:8, 3:10, 3:12,
18:11, 18:12, 22:20,
71:16, 71:18, 75:9,
77:7, 78:22, 78:24,
79:23, 83:24, 86:25,
89:25, 90:23
  Quinoa [2] - 18:11,
82:1
  quoting [1] - 35:19

## R

  raised [1] - 36:20
  rank [4] - 17:19,
28:11, 28:14, 84:2
  rather [1] - 88:10

  reach [2] - 38:20,
84:11
  reached [1] - 84:10
  read [7] - 14:2, 25:9,
25:12, 37:19, 46:11,
46:21, 56:24
  reading [1] - 46:19
  reads [2] - 23:6,
37:21
  ready [2] - 18:8, 27:8
  reason [7] - 6:15,
11:23, 23:25, 42:13,
65:18, 81:18, 89:22
  reason" [1] - 23:14
  reasons [1] - 79:16
  receipt [10] - 42:16,
58:15, 73:10, 73:13,
73:14, 74:4, 74:12,
74:17, 74:18, 75:3
  receipts [1] - 80:11
  receive [14] - 41:17,
46:3, 47:1, 47:16,
48:20, 49:23, 50:5,
50:13, 50:17, 50:21,
66:9, 66:10, 71:20,
87:17
  received [23] - 6:24,
20:11, 22:14, 22:16,
27:1, 47:22, 52:1,
52:4, 52:7, 52:20,
53:5, 54:6, 56:7,
56:10, 56:19, 58:11,
59:5, 69:6, 77:4, 84:4,
84:21, 87:15, 88:20
  receives [3] - 15:11,
23:24, 40:17
  receiving [4] - 50:14,
50:23, 57:8, 57:19
  recent [2] - 54:6,
66:22
  recognize [1] - 28:9
  recognized [1] -
28:13
  recognizes [1] - 30:2
  recollection [1] -
31:23, 73:10, 74:8
  recommendation [1]
- 48:15
  record [49] - 4:15,
4:23, 7:3, 8:9, 9:21,
10:2, 12:1, 12:4, 13:7,
15:4, 16:12, 16:14,
17:16, 18:1, 19:19,
20:7, 20:20, 21:6,
21:14, 24:25, 25:9,
25:10, 25:12, 26:7,
26:15, 27:23, 29:6,
31:10, 37:11, 43:1,
43:12, 46:9, 46:11,
46:12, 46:19, 46:22,

47:9, 48:2, 49:1,
49:17, 54:5, 63:15,
67:14, 75:14, 76:6,
77:3, 83:18, 84:1,
89:11
  recorded [2] - 90:14,
91:5
  recorder [4] - 8:13,
9:13, 18:20, 90:14
  recording [4] - 5:2,
22:17, 25:1, 35:2
  records [1] - 69:12
  redact [1] - 26:11
  redacted [2] - 9:6,
9:8
  redactions [2] - 9:6,
26:11
  referred [2] - 4:16,
13:5
  reflects [1] - 10:2
  refused [1] - 77:21
  refusing [1] - 63:3
  regard [4] - 32:17,
56:16, 58:25, 85:13
  regarding [24] - 16:9,
23:17, 26:21, 26:23,
29:16, 33:8, 40:16,
41:2, 41:5, 41:25,
42:21, 57:8, 59:1,
67:10, 67:15, 76:5,
83:2, 84:16, 84:17,
85:10, 85:24, 86:13,
91:1
  regular [2] - 29:11,
88:1
  regulations [4] -
15:16, 21:22, 23:6,
23:16
  relate [3] - 46:13,
56:6, 86:5
  related [3] - 35:22,
65:1, 79:14
  Relations [4] - 29:10,
53:14, 53:20, 74:21
  relationship [6] -
29:9, 43:13, 44:10,
45:3, 54:18, 71:9
  release [5] - 9:17,
22:7, 23:17, 24:13,
26:24
  released [6] - 58:20,
73:9, 73:18, 73:24,
75:3, 80:10
  relevance [1] - 18:7
  relevant [6] - 8:4,
25:5, 27:6, 42:6,
58:20, 64:15
  remember [1] - 60:3
  rep [1] - 41:17
  Rep [4] - 30:20, 31:3,

31:4, 31:5
  repeat [2] - 37:17,
49:2
  report [1] - 20:10
  Reportable [2] - 4:2,
20:8
  reporter [1] - 37:21
  REPORTER [2] -
3:24, 92:16
  Reporter [2] - 1:18,
92:7
  reporter's [1] - 4:21
  reports [2] - 41:23,
41:24
  represent [13] -
27:16, 28:14, 33:17,
33:20, 39:4, 43:20,
43:23, 44:18, 44:24,
51:14, 56:10, 56:13,
89:20
  representation [1] -
10:12, 32:19, 32:21
  Representative [4] -
7:24, 21:7, 28:21,
31:1
  representative [5] -
30:12, 34:12, 42:1,
51:20, 55:22
  representatives [3] -
41:5, 41:20, 84:5
  represented [6] -
34:1, 44:7, 49:8,
66:16, 66:21, 67:2
  representing [7] -
41:16, 44:20, 52:10,
64:14, 66:12, 80:20,
88:23
  represents [4] -
17:18, 27:19, 51:17,
80:3
  reprimands [1] -
31:19
  reproduce [3] -
62:15, 62:22, 67:22
  reps [2] - 84:7, 84:9
  request [15] - 7:17,
24:16, 34:14, 39:15,
47:15, 60:14, 60:15,
64:17, 75:22, 76:2,
76:3, 76:8, 76:20,
78:15, 90:25
  requested [12] -
5:11, 6:9, 18:23,
48:14, 56:18, 59:20,
59:21, 64:19, 66:1,
76:7, 77:1, 77:13
  requesting [3] -
32:18, 49:14, 64:25
  requests [4] - 57:24,
65:23, 77:18, 84:5

require [1] - 38:5
required [1] - 29:24
requirements [1] - 29:24
reread [1] - 55:14
research [1] - 80:14
reserve [1] - 90:12
residence [1] - 68:5
resolution [1] - 33:16
resolutions [1] - 31:25
Resolutions [1] - 35:8
resort [1] - 27:24
resource [3] - 34:3, 41:11
Resources [1] - 17:11
respect [3] - 12:14, 12:15, 90:11
respectfully [1] - 10:6
respective [5] - 32:23, 38:9, 38:14, 39:3, 40:19
responding [1] - 12:8
response [4] - 11:11, 47:2, 47:17, 84:12
responsibilities [1] - 79:12
responsibility [2] - 56:12, 56:13
result [3] - 11:10, 36:10, 56:11
retain [1] - 54:2
return [4] - 53:13, 53:17, 56:9, 84:21
returned [1] - 53:12
revealing [1] - 36:12
revelation [1] - 12:6
review [87] - 6:17, 7:9, 7:25, 8:7, 8:14, 8:24, 9:8, 9:12, 10:1, 10:21, 18:21, 18:22, 19:24, 20:24, 21:10, 25:1, 25:21, 26:8, 26:14, 27:9, 42:5, 49:2, 51:6, 52:19, 56:4, 56:21, 57:8, 57:21, 58:5, 58:8, 59:7, 59:16, 61:6, 61:11, 61:13, 62:5, 63:22, 63:23, 64:20, 64:25, 65:4, 66:1, 66:13, 67:10, 67:12, 67:16, 67:20, 67:23, 68:8, 68:12, 68:16, 69:14, 69:18, 70:19,

71:21, 71:24, 72:2, 72:4, 72:9, 72:10, 72:23, 75:13, 75:23, 75:25, 76:9, 76:12, 76:23, 76:25, 78:2, 78:8, 78:14, 80:2, 80:18, 82:13, 85:12, 85:18, 86:7, 86:9, 86:11, 86:15, 86:17, 87:3, 87:6, 90:15, 90:16, 90:19
Review [9] - 9:4, 22:8, 26:10, 52:13, 56:8, 57:2, 75:17, 77:10, 80:22
reviewed [14] - 6:19, 7:2, 13:17, 13:18, 19:16, 21:8, 21:11, 27:16, 56:25, 75:12, 76:15, 76:18, 77:19
reviewing [2] - 75:21, 77:24
revolving [1] - 74:10
Richard [1] - 35:7
rigged [1] - 46:15
Rights [4] - 10:17, 10:21, 14:16, 14:21
River [1] - 16:1
Rizzo [1] - 18:14
RIZZO [49] - 2:11, 4:6, 4:12, 4:20, 5:5, 6:3, 6:22, 7:18, 8:20, 11:2, 11:9, 11:15, 11:20, 12:19, 13:2, 13:12, 13:16, 13:18, 13:25, 14:4, 14:18, 15:9, 15:20, 18:14, 22:21, 24:23, 36:8, 37:1, 37:10, 37:16, 37:19, 46:24, 47:8, 47:14, 54:15, 54:21, 55:9, 60:10, 63:3, 63:7, 63:14, 80:16, 81:13, 82:1, 82:7, 82:11, 82:17, 90:2, 90:22
road [1] - 45:24
Road [1] - 1:21
role [14] - 28:7, 28:8, 28:17, 29:6, 33:6, 33:12, 34:15, 36:17, 38:25, 39:8, 41:25, 45:10, 68:20
roles [2] - 33:25
roll [1] - 89:22
room [3] - 4:25, 18:22, 24:21
rooms [1] - 16:4
routine [14] - 6:9, 10:12, 10:13, 27:17,

59:20, 64:8, 64:10, 64:11, 79:8, 79:9, 79:24, 81:1, 88:1, 88:2
routinely [8] - 40:3, 71:21, 75:21, 81:15, 87:3, 87:4, 87:6, 88:7
routing [1] - 80:13
rule [1] - 42:1
rules [5] - 15:16, 21:21, 23:5, 23:16, 37:6
run [1] - 31:8

S

Safety [2] - 19:12, 83:12
Salem [1] - 2:4
sanctions [1] - 22:2
satisfactory [1] - 33:13
satisfied [1] - 6:16
saved [1] - 68:1
saw [4] - 49:13, 56:18, 57:1, 76:11
scapegoat [4] - 83:13, 84:18, 87:24, 88:15
scapegoated [1] - 85:16
Sciarra [8] - 51:23, 65:5, 65:15, 65:16, 65:20, 65:22, 65:25, 66:12
scope [4] - 10:10, 37:9, 38:22, 40:13
screw [10] - 85:6, 85:9, 87:6, 87:8, 87:12, 87:19, 88:3, 88:24, 89:2, 89:3
se [1] - 7:16
second [3] - 11:20, 46:13, 48:25
Second [3] - 28:25, 32:2, 34:22
secretarial [2] - 80:10, 81:9
Secretary [3] - 35:2, 35:4, 35:8
Section [10] - 17:6, 17:11, 17:13, 21:22, 23:5, 23:19, 23:21, 29:7, 35:20, 79:18
sections [1] - 23:20
see [18] - 6:21, 7:19, 8:15, 11:23, 13:10, 14:22, 29:22, 40:6, 56:12, 56:16, 64:15,

64:24, 65:1, 75:5, 77:4, 80:12, 80:21, 87:18
send [4] - 7:18, 65:14, 65:22, 82:16
sending [1] - 51:11
sense [1] - 87:9
sent [20] - 8:2, 47:2, 47:17, 47:24, 51:7, 59:22, 60:16, 63:1, 87:10, 87:11, 87:17, 87:20, 87:22, 87:25, 88:6, 88:9, 88:19, 88:20, 88:23, 88:25
separate [1] - 64:4
Sergeant [14] - 15:23, 17:19, 28:11, 28:14, 28:24, 31:6, 31:8, 31:12, 34:22, 37:12, 51:22, 51:24, 65:20, 73:25
Sergeants [1] - 35:6
serious [2] - 22:2, 34:6
service [3] - 29:23, 29:24, 31:2
services [8] - 34:14, 35:12, 35:13, 35:14, 38:4, 38:7, 38:17, 39:17
settlement [1] - 45:14
several [4] - 18:21, 31:18, 39:10, 53:25
shall [3] - 23:7, 23:13, 24:17
shared [2] - 45:12, 74:13
sharing [1] - 40:19
Sheet [6] - 9:4, 26:10, 52:13, 57:3, 77:10, 80:22
sheet [9] - 57:8, 58:5, 69:10, 71:24, 72:1, 75:23, 75:25, 85:12
Sheets [3] - 22:8, 56:8, 75:17
sheets [52] - 49:2, 51:6, 52:20, 56:21, 57:21, 58:1, 58:8, 59:7, 59:16, 61:6, 61:11, 61:13, 62:5, 63:22, 63:23, 64:20, 65:1, 65:5, 66:1, 66:13, 67:11, 67:12, 68:9, 68:13, 68:16, 69:14, 69:18, 70:19, 72:4, 72:9, 72:10,

72:23, 75:22, 76:9, 76:12, 76:23, 76:25, 78:2, 78:8, 78:14, 80:2, 85:18, 86:8, 86:9, 86:12, 86:16, 87:3, 87:6
Sheraton [3] - 11:11, 81:8, 81:20
short [1] - 31:15
show [3] - 4:13, 5:5, 6:15
Show [3] - 11:5, 11:12, 12:2
showed [1] - 46:1
showing [1] - 4:1
shows [2] - 48:13, 75:3
sides [1] - 12:13
sign [7] - 4:9, 4:10, 7:25, 39:20, 39:23, 69:10, 74:17
sign-in [1] - 69:10
signature [1] - 21:9
signatures [1] - 21:16
signed [5] - 6:11, 21:16, 46:16, 74:4, 74:12
single [2] - 71:24, 72:1
sit [1] - 53:15
sitting [1] - 9:16, 16:3, 18:1, 18:2, 18:3, 41:22, 75:1, 82:4, 82:12
situations [1] - 34:9
six [1] - 84:6
so.. [1] - 7:22
socialize [1] - 45:18
solely [1] - 79:14
solve [1] - 71:11
someone [1] - 14:14
sometimes [1] - 88:16
somewhat [1] - 9:7
soon [1] - 84:8
SOP [4] - 12:22, 15:12, 21:22, 42:8
SOP's [1] - 15:10
sorry [2] - 43:6, 83:22
sort [2] - 5:16, 27:17
sounds [1] - 30:1
sources [1] - 36:12
SP-525 [1] - 4:3
speaking [1] - 41:3
specific [10] - 4:16, 5:25, 26:22, 54:8, 57:21, 64:5, 64:6, 67:15, 77:15, 78:11

specifically [27] - 7:19, 16:1, 22:8, 24:1, 24:4, 24:11, 32:16, 33:15, 39:1, 41:6, 41:9, 45:4, 58:1, 58:7, 64:19, 65:25, 67:1, 67:10, 76:7, 76:10, 76:15, 76:17, 76:21, 77:1, 77:10, 77:13, 78:7
specifics [1] - 6:10
specified [1] - 82:1
spell [2] - 16:19, 18:5
spontaneous [1] - 47:22
spot [1] - 31:9
Staff [7] - 83:8, 83:16, 83:25, 84:11, 84:13, 85:3, 86:16
staff [1] - 34:16
Staff's [1] - 83:15
standard [2] - 5:12, 38:19
STANDARDS [1] - 2:20
Standards [10] - 1:20, 5:10, 7:11, 18:13, 18:25, 20:21, 32:16, 45:9, 88:5, 89:6
standing [3] - 30:24, 38:4, 39:14
Star [3] - 83:10, 88:11, 89:18
start [7] - 8:10, 14:5, 16:18, 18:2, 71:4, 86:8, 88:12
started [1] - 30:20
starting [1] - 4:23
STATE [4] - 1:5, 1:9, 1:10, 2:22
state [3] - 16:19, 18:5, 46:9
State [44] - 1:19, 5:9, 7:10, 8:22, 9:3, 11:5, 11:7, 12:7, 12:16, 14:14, 15:10, 15:14, 16:25, 17:8, 17:15, 17:17, 17:19, 18:16, 18:24, 19:11, 20:8, 20:21, 21:23, 25:18, 26:9, 28:8, 37:7, 38:3, 38:6, 44:8, 52:12, 57:2, 59:3, 67:18, 68:4, 77:9, 77:14, 83:11, 83:21, 88:4, 89:11, 89:14, 89:16, 92:8
statement [14] - 14:17, 15:8, 15:18,

22:2, 22:4, 26:21, 46:20, 80:25, 82:24, 83:7, 90:14, 90:15, 90:17, 91:5
statements [2] - 10:24, 10:25
states [1] - 15:1
stating [4] - 72:9, 75:18, 76:6, 78:14
Station [3] - 28:21, 30:20, 31:1, 31:2, 31:3, 31:5
station [4] - 41:4, 41:17, 41:20, 69:5
staying [1] - 63:21
stems [1] - 22:6
stenographer [1] - 22:24
stenographic [1] - 1:16
Steven [1] - 35:4
STFA [46] - 27:14, 27:16, 27:19, 28:7, 28:8, 28:23, 29:15, 30:20, 30:22, 31:6, 32:5, 32:10, 32:12, 35:11, 35:12, 38:8, 38:11, 39:18, 39:19, 40:20, 43:3, 43:9, 43:10, 43:14, 44:2, 44:5, 44:12, 44:23, 48:9, 49:4, 49:8, 53:10, 55:5, 55:17, 55:18, 55:23, 57:4, 57:13, 60:22, 61:19, 62:1, 62:8, 66:20, 66:21, 68:15, 73:7
still [6] - 13:3, 13:9, 56:7, 59:1, 61:19, 75:1
stop [1] - 37:11
store [1] - 67:22
stories [1] - 83:10
story [1] - 88:11
Street [2] - 2:4, 2:15
streets [1] - 38:20
strongly [1] - 36:5
struck [1] - 13:2
stuff [1] - 77:1
subject [5] - 6:12, 8:5, 10:11, 25:7, 36:15
submit [2] - 10:3, 11:16
Subsection [1] - 21:23
substantiative [2] - 8:10, 10:1
suffering [1] - 81:2
suicide [2] - 23:8,

23:9
Suite [1] - 1:21
summary [2] - 31:20, 34:4
summer [1] - 74:25
SUPERINTENDENT [1] - 1:9
Superintendent [3] - 29:18, 48:14, 48:16
supervision [1] - 23:3
supervisors [1] - 72:4
Supervisory [4] - 22:8, 56:8, 75:17, 80:22
supervisory [4] - 64:19, 64:25, 75:25, 80:18
supply [2] - 24:8, 62:18
support [2] - 35:12, 35:13
supposed [1] - 74:22
suspension [2] - 22:3, 34:3
sworn [1] - 15:10
system [1] - 46:15

## T

tape [1] - 91:5
target [1] - 84:15
targeting [1] - 84:19
Tavern [4] - 1:20, 16:3, 16:4, 16:5
telephone [1] - 50:13
tenure [1] - 39:19
term [2] - 38:12, 40:5
termination [1] - 22:3
terms [3] - 4:13, 28:16, 29:11
THE [2] - 1:9, 2:17
theft [3] - 7:2, 13:8, 19:15
themselves [2] - 18:5, 89:17
therefore [1] - 87:17
thinking [1] - 4:12
thoughts [1] - 27:2
thousands [2] - 62:14, 72:20
three [3] - 8:3, 25:4, 58:21
three-person [1] - 58:21
throughout [2] - 38:3, 39:19

thumb [1] - 68:2
Thursday [3] - 8:2, 25:3, 27:1
timeframe [2] - 32:7, 61:4
title [2] - 34:17, 39:24
titled [1] - 23:16
today [6] - 10:4, 13:24, 14:17, 18:7, 79:4, 90:11
together [2] - 45:11, 45:24
Toms [1] - 16:1
took [2] - 27:5, 31:16
top [1] - 52:17
total [1] - 30:19
totally [1] - 36:20
touched [1] - 28:1
track [1] - 74:9
tracks [1] - 83:10
training [1] - 29:23
TRAINOR [1] - 3:23
transcribed [1] - 5:17
transcript [3] - 4:21, 90:19, 92:10
TRANSCRIPT [1] - 1:16
transcription [1] - 5:17
Treasurer [1] - 35:1
treat [1] - 24:3
treated [1] - 90:10
Trenton [1] - 2:16
tried [2] - 9:7, 84:11
Troop [2] - 31:4, 45:24
Trooper [41] - 4:2, 6:23, 7:1, 7:9, 8:7, 8:21, 9:2, 12:20, 16:8, 16:13, 16:18, 16:21, 18:1, 18:20, 18:23, 19:14, 20:12, 20:23, 21:16, 21:21, 24:25, 26:8, 26:14, 26:20, 28:6, 34:20, 34:25, 35:1, 35:4, 35:6, 35:7, 35:8, 38:6, 49:7, 51:17, 51:18, 75:11, 82:19, 87:1, 90:8, 91:6
trooper [9] - 29:25, 38:8, 39:7, 41:15, 41:16, 44:6, 45:13, 80:21, 81:2
TROOPER [1] - 2:6
trooper/client [1] - 44:22
troopers [8] - 17:19,

28:10, 28:13, 29:12, 33:20, 55:4, 55:15, 69:4
TROOPERS [1] - 1:5
Troopers' [4] - 17:8, 17:15, 17:17, 28:9
true [2] - 23:4, 92:9
trust [1] - 71:2
trusting [1] - 71:4
truth [2] - 82:24, 88:15
try [5] - 6:5, 52:15, 75:15, 75:16, 89:22
trying [10] - 41:13, 41:14, 83:9, 84:8, 85:17, 88:5, 88:24, 89:6, 89:7, 89:8
turn [4] - 26:19, 51:5, 74:20, 90:14
turning [1] - 18:19, 25:1
two [2] - 5:13, 12:5, 16:4, 23:15, 31:2, 35:6, 48:2, 49:20, 50:4, 50:19, 50:23, 74:24
type [6] - 10:17, 48:20, 52:4, 52:6, 53:22, 71:14
typical [1] - 36:19

## U

ultimately [1] - 22:13
unadjudicated [1] - 82:12
unauthorized [5] - 9:17, 22:7, 23:17, 24:9, 26:23
uncover [1] - 14:5
under [12] - 10:3, 10:15, 10:20, 10:23, 10:25, 15:7, 15:9, 17:19, 25:13, 28:10, 28:14, 42:1
undergoing [1] - 81:3
understood [1] - 5:18
uninterrupted [1] - 29:19
union [17] - 10:12, 30:7, 36:2, 36:11, 36:25, 37:2, 40:2, 40:15, 41:4, 43:21, 48:21, 52:6, 53:22, 57:15, 79:5, 79:14, 82:2
unique [1] - 5:16

**Unit** [3] - 15:25, 16:2, 32:16
  **unless** [3] - 23:25, 24:3, 24:11
  **unrelated** [1] - 36:1
  **unusual** [3] - 22:24, 48:19, 81:3
  **up** [35] - 7:21, 14:2, 14:24, 15:3, 27:4, 28:2, 28:12, 31:5, 31:7, 32:5, 34:2, 34:12, 48:17, 55:2, 58:23, 60:6, 60:15, 64:7, 70:21, 71:9, 71:14, 74:15, 81:8, 81:19, 85:6, 85:9, 87:6, 87:8, 87:12, 87:19, 88:3, 88:24, 89:2, 89:3, 89:6
  **US** [1] - 1:1
  **uses** [1] - 36:13

**V**

**variety** [1] - 79:16
**various** [1] - 28:23
**verified** [1] - 12:2
**verify** [1] - 75:6
**version** [1] - 45:17
**via** [2] - 60:18, 65:8
**Vice** [14] - 28:24, 28:25, 29:1, 29:16, 31:15, 31:16, 32:2, 32:4, 33:25, 34:20, 34:22, 34:24, 68:17, 68:24
  **Victor** [2] - 57:24, 64:20
  **Vincent** [5] - 18:14, 22:11, 27:18, 43:13, 57:20
  **VINCENT** [1] - 2:11
  **violated** [1] - 37:6
  **violates** [3] - 79:17, 79:19
  **violating** [1] - 36:5
  **violation** [2] - 5:20, 23:5
  **visits** [1] - 69:12
  **vs** [1] - 1:8

**W**

**Wambold** [7] - 51:22, 51:24, 65:21, 84:17, 85:14, 86:14, 89:10
  **Wambold-Juckett** [4] - 84:17, 85:14, 86:14, 89:10

**wasting** [1] - 80:14
**Wayne** [1] - 34:25
**weapons** [1] - 29:23
**weekday** [1] - 27:12
**Weingarten** [4] - 6:4, 21:7, 32:18, 84:5
  **Weingartner** [3] - 7:24, 41:25, 42:1
  **whatsoever** [2] - 79:6, 79:11
  **whole** [3] - 26:12, 79:16, 80:25
  **wide** [1] - 43:11
  **willfully** [1] - 23:21
  **WILLIAM** [1] - 2:24
  **William** [2] - 15:23, 35:6
  **wind** [1] - 7:21
  **window** [1] - 13:23
  **witch** [3] - 83:9, 84:18, 85:15
  **withhold** [1] - 23:13
  **Witness** [2] - 7:11, 20:22
  **witness** [4] - 22:10, 49:18, 55:8, 67:4
  **WITNESS** [1] - 3:4
  **witnesses** [1] - 32:20
  **woke** [1] - 27:4
  **word** [1] - 41:15
  **words** [4] - 14:4, 58:23, 70:9, 89:7
  **writes** [1] - 88:11
  **writing** [3] - 40:22, 40:23, 41:19
  **written** [5] - 40:15, 40:25, 81:7, 81:17, 81:20

**X**

**XI0-1611** [1] - 3:25
**XIO-1611** [1] - 92:17

**Y**

**year** [1] - 45:7
**years** [18] - 16:24, 28:20, 29:1, 30:18, 30:19, 30:21, 31:2, 31:18, 31:22, 32:3, 32:8, 43:18, 53:25, 57:3, 57:6, 66:23, 72:14, 89:17
  **yourself** [4] - 12:20, 19:24, 45:15, 68:24

**Z**

**Zanyor** [2] - 34:21, 68:17